**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ATEN INTERNATIONAL CO., LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>UNICLASS TECHNOLOGY CO., LTD.,<br>ELECTRONIC TECHNOLOGY CO., LTD.<br>OF DONGGUAN UNICLASS,<br>AIRLINK 101,<br>PHOEBE MICRO INC.,<br>BROADTECH INTERNATIONAL CO.,<br>LTD.<br>D/B/A/ LINKSKEY, BLACK BOX<br>CORPORATION, and<br>BLACK BOX CORPORATION OF<br>PENNSYLVANIA,<br><br>    Defendants. | **Civil Action No. 2:14-CV-00852-JRG**<br><br>**JURY TRIAL DEMANDED** |

## DEFENDANTS' JOINT RESPONSE TO PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ..................................................................................................... 3

    A.    '289 Patent titled "Intelligent Computer Switch" ..................................... 5

        1.    "control device" ..................................................................... 5

        2.    "repeatedly detect" and "repeatedly determine" ........................... 5

    B.    '287 and '217 Patents titled "Asynchronous/Synchronous KVMP Switch for Console and Peripheral Devices" ....................................................... 7

        1.    "wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems" and "without interruption of the signal to the one or more than one peripheral device" ......................................................................... 9

        2.    Means Plus Function Limitations of the '287 and '217 patents ................ 14

        3.    "repeatedly polling", "enumerate", and "management program" ............. 18

        4.    "host control module ............................................................. 20

        5.    "device control module" ........................................................ 21

        6.    "hub switch module;" and "such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer" ....................................... 21

        7.    "emulating one or more of the console devices" ........................... 22

    C.    '141 Patent titled "Resource Sharing Apparatus Which Disconnects an Input Device When Detecting a Standby Indication of a Switching Command" ........................................................................................ 23

        1.    "standby indication" and "determining whether the first input signal comprises a standby indication of a switch command" .................. 25

        2.    "disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host" and "wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus" ................................. 26

3.    "monitor" ................................................................................... 26

4.    "connect" and "disconnect" ...................................................... 27

D.    '275 Patent titled "Electronic Switching Device for a Universal Serial Buss Interface" ............................................................................... 28

1.    "wherein the input of the control signal generator consists of the connection to the output of the trigger signal generator" and "for receiving only the trigger signal outputted from the trigger signal generator" ...................................................................................... 29

2.    "connector" ................................................................................ 30

3.    "trigger signal generator;" and "control signal generator" ......................... 30

III.    CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Aten Int'l Co., Ltd., et al. v. Emine Tech Co., Ltd., et al.*,
CV No. SACV 09-0943 (CDCA) ......................................................................9

*Autogiro Co. of America v. United States*,
384 F.2d 391 (Ct. Cl. 1967). ...........................................................................4

*Bell Atlantic Network Serv. V. Covad Com.*,
262 F.3d 1258 (Fed. Cir. 2001) .......................................................................4

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) .......................................................................3

*Ekchian v. Home Depot., Inc.*,
04 F.3d 1299 (Fed. Cir. 1997).........................................................................5

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) .........................................................................................4

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..............................................................................................4

*H-W Technology, L.C. v. Overstock.com, Inc.*,
758 F.3d 1329 (Fed. Cir. 2014) .....................................................................29

*Mannesmann Demag Corp. v. Engineered Metal Products Co.*,
793 F.2d 1279 (Fed. Cir. 1986) .....................................................................29

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)...........................................................................3

MedImmune, Inc. v. Genentech, Inc.,
127 S. Ct. 764 (2007) .......................................................................................2

*Phillips v. AWH*,
415 F.3d 1303 (Fed. Cir. 2005) .......................................................................3

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) .......................................................................3

*Southwall Techs. Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995)..........................................................................8

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998) .......................................................................8

iv

*Torpharm, Inc. v. Ranbaxy Pharmaceuticals*,
336 F.3d 1322 (Fed. Cir. 2003) ..................................................................................5

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
837 F.2d 1044 (Fed. Cir. 1988) ..................................................................................3

*Verizon Servs. Corp v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ................................................................................11

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)....................................................................................3

## **STATUTES**

35 U.S.C. § 112......................................................................................................17

## **RULES**

35 C.F.R. §§1.951, 1.116 ........................................................................................30

TABLE OF EXHIBITS IN SUPPORT OF DEFENDANTS' RESPONSE TO ATEN'S
OPENING CLAIM CONSTRUCTION BRIEF

| Exhibit | Description |
|---|---|
| 1. | Aten's PR 4-1 Disclosure. |
| 2. | Aten's PR 4-2 Disclosure. |
| 3. | Copies of relevant portions of the Prosecution History of the '287 patent June 17, 2008 Notice of Allowability ATEN 0004332-4338; March 6, 2005 Response and Amendment ATEN00043434361; December 8, 2004 Office Action ATEN 4363-4368 and ATEN0004376-4382; and ATEN0004282-4449. |
| 4. | Copies of the relevant portions of the Prosecution History of the '217 patent August 26, 2008 Notice of Allowability ATEN0000343-349; May 28, 2008 Response to Office Action ATEN0000357-366; and, April 10, 2008 Office Action ATEN0000411-421. |
| 5. | Copies of the relevant portions of the Prosecution History of the '141 Patent |
| 6. | Copies of the relevant portions of the Prosecution History of the '275 Patent |
| 7. | Copy of Central District of California Claim Construction Order in the *Aten International Co., Ltd v. Emine Technology Co., Ltd. et al.*, case no. SACV 09-0843 AG ("CDCA Construction Order"). |
| 8. | Aten's Claim Construction Brief in the *Aten International Co., Ltd v. Emine Technology Co., Ltd. et al.*, case no. SACV 09-0843 AG ("Aten's CDCA Construction Brief"). |
| 9. | Aten's Claim Construction Presentation Slides for the '287 patent in the *Aten International Co., Ltd v. Emine Technology Co., Ltd. et al.*, case no. SACV 09-0843 AG ("Aten's CDCA '287 Patent Presentation Slides"). |
| 10. | Belkin International, Inc.'s Claim Construction Brief in the *Aten International Co., Ltd v. Emine Technology Co., Ltd. et al.*, case no. SACV 09-0843 AG ("Belkin's CDCA Construction Brief"). |
| 11. | Belkin International, Inc.'s Claim Construction Presentation Slides for the '287 patent in the *Aten International Co., Ltd v. Emine Technology Co., Ltd. et al.*, case no. SACV 09-0843 AG ("Belkin's CDCA '287 Patent Presentation Slides"). |
| 12. | Excerpts from the May 27, 2015 deposition of Charles Narad. |
| 13. | Declaration of Michael Wirthlin, Ph.D. |
| 14. | Aten's identification and proposed constructions in the *Emine* litigation: March 18, 2011 and March 29, 2011 letters from Perkins Coie, previous counsel for Aten. |
| 15. | May 19, 2015 letter from Robert Aycock to Whitney Reichel re '275 patent clerical error. |
| 16. | May 20, 2015 email from Whitney Reichel counsel for Aten re '275 patent clerical error. |
| 17. | Computer Science and Communications Dictionary, Vol. 1, Martin Reik (ed.) |

## I.    INTRODUCTION

Plaintiff Aten International Co., Ltd. ("Aten") is asserting 60 claims from five patents[1]

against over 120 of Defendants' products.  Despite the large number of claims in a highly

technical field, Aten contends in its Opening Claim Construction Brief ("Opening Brief") that,

with the exception of the means-plus-function limitations, a "plain and ordinary meaning"

("PAOM") blanket-construction should be applied to all disputed terms.[2]  Aten's proposed

PAOM should be rejected because Aten's purported PAOM constructions (i) do not account for

significant, narrowing amendments and disclaimers made during prosecution to overcome the

prior art—Aten should not be able to construe the claims narrowly before the PTO and later

broadly before the court; (ii) do not account for relevant context and specialized usages from the

specifications of the asserted patents; (iii) are inconsistent with Aten's claim construction

position taken in a previous litigation; and (iv) are inconsistent with the claim constructions

adopted by another federal trial court with respect to the same Aten patents asserted in this

litigation.

Claim 45 of the '275 Patent, which Aten asserts even though it was mistakenly issued by

the United States Patent and Trademark Office ("USPTO") exemplifies the unreasonableness of

Aten's blanket PAOM construction. Claim 45 was erroneously issued after a reexamination

proceeding due to a clerical error by the USPTO.  This clerical error is clearly evident from the

---

[1] The asserted patents in this litigation are United States Patents Nos. 7,640,289 ("'289 patent") claims 1-27, 6,957,287 ("'287 patent") claims 1, 3-7, 7,472,217 ("'217 patent) claims 1, 3-7, 8,589,141 ("'141 patent) claims 1-27, and 6,564,275 ("'275 patent") claim 45 (collectively, "patents-at-issue").

[2] In its PR 4-1, 4-2 and 4-3 disclosures, Aten offered no terms up for construction and provided no explanation as to what it understood or meant by simply stating that all of the terms of the asserted patents, including the disputed terms identified by Defendants should be given a PAOM. *See* Exhibits 1 and 2, Copies of Aten's PR 4-1 and 4-2 disclosures, and Dkt. No. 86 Joint Claim Construction and Prehearing Statement. Only now, in it its Opening Brief, has Aten explained its position.

record of the reexamination proceedings, and Defendants have raised the issue several times with Aten. Ex. 15, Defendants' Answers to Third Amended Complaint Dkt. Nos. 89-91. Nevertheless, Aten continues to force Defendants, and this Court, to unnecessarily construe the terms of this unenforceable claim by saying that "[w]e are investigating the assertions in your letter and will respond in due course (though we do not anticipate we will be able to complete this investigation before your claim construction brief is due next week)." Ex. 16. Aten should have a better answer than this, and this error should have been addressed in its pre-filing investigation and certainly before claim construction.

Aten's collateral attack on Defendants' right to challenge the alleged infringement or validity of the patents further demonstrates the unreasonableness of Aten's PAOM construction. In particular, in its Opening Brief, Aten asserts a theory that because Defendant Uniclass Technology Co. ("Uniclass") is a former Aten licensee in breach of their license agreement, Defendants are estopped from challenging the alleged infringement or the validity of Aten's patents. Aten contends that if Defendants are in breach of the royalty provisions of the parties' license agreement that Defendants are *de facto* also infringing. This conclusion is wrong for several reasons including that the license agreement itself exculpates the payment of royalties should the claims of the patents be materially limited or declared invalid. Aten's position also ignores Supreme Court precedent that allows a licensee to challenge the validity of a patent. *See, e.g., MedImmune, Inc. v. Genentech, Inc.,* 127 S. Ct. 764 (2007) (holding that even a licensee in good standing can challenge validity of patent). In any event, while the aforementioned license was still in place, Judge Guilford of the Central District of California in Aten's previous litigation on the '287 and '275 patents, construed some of the critical terms at issue here such that the accused products fall outside the scope of the claims.

In short, Aten's proposed PAOM constructions should be rejected for at least the reasons given above, but primarily because it is inconsistent with Aten's prosecution and previous litigation claim construction positions. Defendants' constructions are true to the claim language, specifications, prosecution histories, and extrinsic evidence and should therefore be adopted.

## II.     ARGUMENT

"[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips v. AWH*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). The meaning of a term will usually be consistent with the context in which it appears and with other terms and phrases in the claim. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1251 (Fed. Cir. 1998). However, claims do not always incorporate all disclosures in the specification. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988).

Claims are not to be interpreted in a vacuum, but are "read in light of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Indeed, "properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The drawings are considered part of the specification. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1056 (Fed. Cir. 1988).

"Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. As such, the record before the PTO is often of critical significance in determining the meaning and scope of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Prosecution history informs claim construction because it reflects the patentee's surrender of claim scope in

exchange for patentability. *Autogiro Co. of America v. United States*, 384 F.2d 391, 398-99 (Ct. Cl. 1967).

Thus, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. A patentee's decision to submit an amended claim in response to an examiner's rejection "is taken as a concession that the invention as patented does not reach as far as the original claim." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002). Moreover, there is a presumption that an amendment constitutes a surrender of all of "the territory between the original claim and the amended claim." *Id.* at 740.

Aten's failure in its Opening Brief to account for its narrowing arguments and amendments made during prosecution of the patents-at-issue is contrary to "well settled" Supreme Court and Federal Circuit precedent "that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office." *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966). The Court "must [] examine the prosecution history to determine whether the patentee has relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." *Bell Atlantic Network Serv. V. Covad Com.*, 262 F.3d 1258, 1262 (Fed. Cir. 2001).

Express disavowal of claim scope during prosecution is not limited to use of the specific words, "I disavow," but includes "any express representations made in obtaining the patent regarding the scope and meaning of the claims." *Bell Atlantic*, 262 F.3d. at 1262. Express disavowals also include arguments made to the examiner in order to distinguish prior art references "since, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, [the applicant] is by implication surrendering such

4

protection." *Ekchian v. Home Depot., Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).

    **A.**    **'289 Patent titled "Intelligent Computer Switch"**

        **1.**    *"control device"*

In view of the recent transfer of this case to the CDCA and in anticipation of having to limit the number of terms to be construed in accordance with the rules in that jurisdiction, Defendants propose that the PAOM may be applied to this term.  If the CDCA permits the construction of additional terms and/or supplemental briefing on claim construction, Defendants reserve their right to further address the meaning of this term ("Same response as Section A(1)").

        **2.**    *"repeatedly detect" and "repeatedly determine"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "repeatedly detecting" | PAOM | "Automatically and continuously monitoring." |
| "repeatedly determining" | PAOM | "Automatically and continuously designating." |

With Aten and its expert's explanation of their understanding of "detecting" and "determining," Defendants can agree that the PAOM for these terms govern. However, Defendants assert that the term "repeatedly" must be construed.

Defendants proposed constructions for "repeatedly" as it appears in the claims is "automatic and continuous." This construction is helpful in understanding how the term is actually used and understood consistent with its plain meaning in the context of the claimed invention. *See Phillips*, 415 F.3d at 1312-13.  Throughout its specification, from the Abstract through the claims, the '289 patent explains that "repeatedly detecting" and "repeatedly determining" means a process that is both automatic and continuous. Ex. 13, Wirthlin Dec. at ¶¶ 22-27.  The Abstract states that the invention has "has an automatic detection capacity…." '289 patent Abstract. The *Field of the Invention* section of the '289 specification explains that "repeatedly" is both "automatic" and "continuous," stating that "[t]he present invention relates to

an intelligent computer switch and especially to an intelligent computer switch with an **auto** detecting function and an **auto** adjusting function as a series connection sequence is changed." '289 patent at 1:9-12. The *Summary of the Invention* explains that the problem the '289 invention addresses is the:

> need to have a computer switch that can automatically generated [sic] series number thereof and automatically arrange the connection sequence. In particular, if the series connection sequence is changed, the computer switches can automatically rearrange their series numbers and control by the new master computer switch …. The present invention discloses an intelligent computer switch with an automatic detection capacity…

*Id.* at 1:60–2:7. "Therefore, the intelligent computer switch according to the present invention can detect and arrange the series connection sequence automatically." *Id.* at 2:34-36. The *Detailed Description of the Preferred Embodiment* section of the '289 also supports that "repeatedly detecting and "repeatedly determining" is done automatically and continuously: "[d]ue to the previous process, the intelligent computer switches according to the present invention can automatically detect and arrange the sequence thereof." *Id.* at 4:66–5:1. The patentee further explained that "[i]n particular, as the series connection sequence is changed, the intelligent computer switch immediately detects the master, determines the slave sequence, and the master obtains information from all server computers." *Id.* at 5:6-9.

Figure 3 of the '289 patent further supports that "repeatedly detecting and "repeatedly determining" is an automatic and continuous process. As described in the specification, "in step 690, the master continues detecting whether or not any new slave has been added. Both master and slave go back to step 620 after a predetermined period to detect whether or not the series connection sequence has changed." '289 patent at 4:61-65. As the specification makes clear, the process of "repeatedly detecting" and "repeatedly determining" is automatically and continuously done "whether or not any new slave has been added" and is done at a "predetermined period to detect whether or not the series connection sequence has changed." *Id.*

6

Thus, Defendant's proposed construction is supported by the intrinsic record, is consistent with the actual language of the claims, and reflects the very solution to the problem that the patentees said its invention addressed. *Id.* at 1:60 – 2:7.

During his deposition, Aten's expert stated that "automatic" means "without user intervention." Ex. 12, Narad Tr. 47:3-5. The expert then admitted that "repeatedly" means the same thing: "my understanding is that repeated detection occurs without any user intervention." *Id.*, 47:17-23. Similarly, the expert testified that "repeated" in the context of the term "repeatedly polling" also means without human intervention, *i.e.*, that it is automatic. *Id.*, 54:7-22. There is no doubt that "repeated" includes within its meaning "automatic."

With respect to including "continuously" within the meaning of "repeatedly," Aten's expert agreed that "repeatedly" means without end. *Id.*, 49:23-50:3 ("The patent does not describe an end to repeatedly detecting or to repeatedly determining."). Continuously means without an end. *See* http://www.thesaurus.com/browse/without+end (without end is a synonym for continuously) (5/29/15). Further, Aten's expert conceded that repeatedly detecting in the context of the patent means "continues" detecting. *Id.*, 50:10-51:16. However, the term "repeatedly" does not, on its face, make it known that the action is continuous. Thus, inclusion of the word continuously is helpful in describing repeatedly.

B. **'287 and '217 Patents titled "Asynchronous/Synchronous KVMP Switch for Console and Peripheral Devices"[3]**

---

[3] Aten attempts to misdirect the court away from the "synchronous" portion of the title of the '287 and '217 patents by calling them the "Asynchronous Switching Patents." Rather than help its position, the notable absence of the word "synchronous" casts light on what Aten is really trying to do: read "synchronous" out of the patent. However, this is not possible as "synchronous" is an integral part of the claim, including the "without interruption" limitation. Originally, Aten had titled the '287 patent application as "Signal Switch for Console and Peripheral Devices." Ex. 3, Pros. His. '287, at ATEN 0004428. However, in the December 8, 2004 Office Action, the Examiner stated that "[a] new title is required that is clearly indicative of the invention to which the claims are directed." *Id.* at ATEN 0004378. Aten overcame this

The principal dispute over claim construction in the '287 and '217 patents centers on Aten's attempt to have the limitation "without interruption" apply only to asynchronous switching. Such a construction would require the Court to adopt a construction that disregards and ignores Aten's many prosecution arguments made to overcome the prior art. During prosecution, Aten argued that the claimed invention switched both synchronously and asynchronously without interrupting the signal and/or data flow.[4]  These arguments, which the examiner accepted, compel a construction that requires both (i) switching synchronously without interrupting the data flow, and (ii) switching asynchronously without interrupting the data flow. *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."); *see also Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998).

Moreover, Defendants deserve "[t]he public notice function of a patent and its prosecution history [that] requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular device [or method] and then change position and later sue a party who makes [or practices] that same device [or method] for infringement."  *Springs Window Fashions, LP v. Novo Industries, LP*, 323 F.3d 989, 995 (Fed. Cir. 2003).

Aten already lost this argument before Judge Guilford. *Aten Int'l Co., Ltd., et al. v. Emine*

---

objection "by amending the title of the present application to the new title 'Asynchronous/Synchronous KVMP Switch for Console and Peripheral Devices.'" *Id.* at ATEN0004348.

[4] Aten's expert testified that the meaning of "signal" is the same as "data stream" and that "data stream" is a portion of the "data flow." Narad Tr. 37:10-14 (A. "Is a signal and a data stream in this paragraph the same entity; is that correct? Q. Do they have the same meaning? A. Have the same meaning. Yes. [citing to Ex. 3 to Tr., '287 Pros. His., ATEN 4356, p. 14].); *id.*, 39:9-14.

*Tech Co., Ltd., et al.*, CV No. SACV 09-0943 (CDCA) ("*Emine* litigation"). Ex. 7 at 10-25.[5] In adopting his constructions concerning the '287 patent, Judge Guilford rejected arguments similar to those Aten now makes because the prosecution history of the '287 patent is clear that Aten argued that the claimed invention requires uninterrupted data flow for both synchronous and asynchronous switching to overcome the prior art cited by the examiner. *Id*. at 13-14 and 18-24. Much of what was accepted by Judge Guilford was argued by the defendant Belkin in that case. *See* Ex. 11. Shortly after the Construction Order issued, the parties settled, and requested that the Order be vacated.  However, the analysis is sound and should be adopted in this case.

      1.      *"wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems" and "without interruption of the signal to the one or more than one peripheral device"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device to the same one of the plurality of computer systems or to different ones of the plurality of computer systems" | PAOM; In the alternative, "wherein console devices can be switched among computer systems either together (synchronously) with the switching of peripheral devices or independently (asynchronously) | "Console devices can be switched from a first computer system to another computer system either together with the switching of peripheral devices (i.e., synchronous switching) or independently from the switching of peripheral devices (i.e., asynchronous switching). The signal switch must be able to perform both synchronous and asynchronous switching such that the data stream passing between the first computer system and the peripheral device is left uninterrupted at the time of switching." |
| "without interruption of the signal to the one or more than one peripheral device" | PAOM; In the alternative, "wherein the switching asynchronously can be done without interruption of the | "There is no interruption of the signal between the then-connected computer system and the peripheral device" |

---

[5] Defendants' proposed constructions for the '287 and '217 patents track Judge Guilford's constructions. Where there are slight differences, Defendants have attempted to provide additional clarity that is consistent with the claim language, specification, and prosecution histories.  Despite these slight variations, Defendants are willing to accept the constructions adopted by Judge Guilford/CDCA.

| | signal to the one or more than one peripheral device" | |
|---|---|---|

Aten characterizes Defendants' constructions for these terms as being "based on misinterpretations of the specification and prosecution history." Opening Brief at 20. As demonstrated below, Defendants do not interpret the specification or prosecution history, but rely on the very language of the claims, of the specification, and Aten's own prosecution statements.

The plain claim language verifies that "without interruption of the signal to the one or more than one peripheral device" applies to both synchronous and asynchronous switching. Ex. 13, Wirthlin Dec. at ¶ 62.  This claim language begins by reciting that switching can be done synchronously or asynchronously: "*wherein the console devices can be switched either synchronously or asynchronously with the one or more than one peripheral device....*" An explanatory phrase follows: "*to the same one of the plurality of computer systems or to different ones of the plurality of computer systems, ....*" And then concludes by reciting that the switching is done without interruption: "*without interruption of the signal to the one or more than one peripheral device.*" '287 patent at 8:8-14 (emphasis added).  The CDCA in its Construction Order explained this three-part breakdown, "[s]ince the claim language first states the two choices for switching, and then provides additional description for the switching choices in the second part, 'without interruption' in the final part must apply to both types of switching noted in the first part." Ex. 7, CDCA Constr. Order, at 12. Aten's present arguments do nothing to refute this analysis.

The specification of the '287 and '217 patents further supports that "without interruption" applies to both synchronous and asynchronous switching: "[a] problem with current KVM switches is that if a USB peripheral, such as a printer, is connected to the switch, data flow is interrupted to that peripheral when the switch is changed." '287 patent at 1:21-24. Ex. 13,

Wirthlin Dec. at ¶ 52-54. The specification then identifies the needed solution to this problem:

> [w]hat is needed is a KVM switch that is also a peripheral sharing switch, which would allow all the computers connected to the switch to share any USB peripheral devices without interruption of data flow to that peripheral when the switch is changed, and which would switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously.

*Id.* at 1:53-60).[6]  The "Summary of the Invention" then clearly states that:

> The present invention meets this need by providing a KVM switch that is also a peripheral sharing switch, which allows all the computers connected to the switch to share any USB peripheral devices, and which can switch the KVM channels and peripheral channels to a common computer or to different computers either asynchronously or synchronously without interruption of data flow to that peripheral when the switch is changed. USB peripherals may be synchronously or asynchronously switched with the KVM channels.

'287 patent at 1:64 – 2:5. *Verizon Servs. Corp v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308

(Fed. Cir. 2007) (holding that a claim term properly limited to what the patent identified as the

'present invention.'). With respect to this passage from the specification, the CDCA in its

Construction Order noted:

> Compared with claim 1, this passage both (1) reverses the order of 'asynchronously' and 'synchronously' and (2) drops the comma before 'without interruption.' This clearly shows that the invention discloses both synchronous and asynchronous switching without interruption of data flow, and by [Aten's] proposed construction this specification language would be inaccurate. Trying to bolster their argument, [Aten] argue[s] that the specification only teaches asynchronous switching without interruption, and not synchronous switching without interruption. (Plaintiffs' Brief at 18.) But the few stray examples in the specification that [Aten] cite[s] are not enough to refute the plain claim and specification language previously noted. *See, e.g., Phillips,* 415 F.3d at 1312.

Ex. 7, CDCA Construction Order at 13. Having failed to persuade the CDCA, Aten now cites a

different section of the specification to support its tenuous construction: "The signal switch of

the present invention is the combination of a KVM (keyboard video mouse) switch and a

peripheral sharing switch." '287 patent at 3:33-35.  However, this section also fails to overcome

---

[6] The '287 and '217 patents teach that synchronous switching occurs when peripheral devices are switched together with console devices while asynchronous switching occurs when the peripheral devices are switched separately from console devices. '287 patent at 3:40-44

the plain language of the claim and the other numerous specification references that "without interruption" applies to both synchronous and asynchronous switching. The citation Aten now cites does not even address asynchronous or synchronous switching let alone limit the switching to asynchronous.

The prosecution history of the '287 patent also supports Defendants' proposed construction and refutes Aten's. Ex. 13, Wirthlin Dec. at ¶ 62. In its first issued Office Action on December 8, 2004, the PTO rejected all claims of the initially filed '287 patent application as being obvious in view of U.S. Patent No. 6,671,756 ("Thomas") in view of U.S. Patent No. 6,549,966 ("Dickens"). Ex. 3, at ATEN0004376-4381. In its March 6, 2005 response to this rejection, Aten argued that its pending claims were patentable because what it called the "present invention" "provid[es] a KVM switch which can switch the KVM channels and peripheral channels (i) to a common computer or to different computers either asynchronously or synchronously and (ii) without interruption of data flow to that peripheral when the switch is changed." *Id*. at 6-7, ATEN0004348-4349. Aten also amended claim 1 with the entire "wherein" clause now being construed, stating that "[i]n order to better point out and distinctly claim the invention, Claim 1 has been amended to add" this limitation. *Id.* at ATEN0004345 and 4350.

Further in its March 6, 2005 response, Aten clearly argued that synchronous and asynchronous switching of the console and peripheral devices without interruption of dataflow to peripherals was the primary feature that distinguished its invention from the prior art. In response to the PTO's rejection directed to Dickens, Aten under the heading "Dickens et al. Do Not Teach Asynchronous/Synchronous Switching" used what it called a "simple example" to "demonstrate the difference between Dickens et al. and the present invention," and referring to Figure 1, stated:

By way of example, suppose that in an initial state, console devices (14, 16, 18) and

12

printer 22 are connected to first computer 121, which is sending a signal through switch 10 to printer 22 (a document being spooled, for example). The user now switches to a second state, <u>in which switch 10 synchronously connects console devices (14, 16, 18) and printer 22 to second computer 122. The data stream coming from first computer 121 at the time of the switching is left unaffected</u> (the document being spooled finished printing), but otherwise printer 22 is now connected to second computer 122: 'actual console devices may be switched to a second or different computer system, leaving any channels between the first computer system and peripherals connected, any data flow in such channels uninterrupted, and the first computer system still processing as if the actual console devices, now emulated, were still connected.'

*Id*. at ATEN0004355-4356. Aten, then more clearly pointed out this distinction, stating:

> Therefore, Dickens et al., neither alone nor in combination with Thomas et al., teach or fairly suggest switching the console devices either synchronously or asynchronously with one or more peripheral devices to the same one of a plurality of computer systems, or to different ones of the plurality of computer systems, without interruption of the signal to the one or more peripheral devices.

*Id*. at ATEN0004357.[7] Now, after surrendering a KVMP switch that only requires that "without interruption" apply to asynchronously switching, Aten is precluded from reclaiming it during claim construction. *See Vitronics*, 90 F.3d at 1583; *also Southwall Techs*, 54 F.3d at 1576.

Aten attempts to distinguish the quoted language from the prosecution history above by arguing that the data stream only pertains to data that has already been transferred to the printer, *i.e.*, spooled. However, during deposition, Aten's expert was unable to support this position by directly contradicting his own testimony:

> Q. So when we look at spooling within the prosecution history of the '287 patent, it's referring to data that's already been transferred to the peripheral [printer], correct?
> A. No.

Ex. 12, Narad Tr. 33:23-34:5; 39:15-19; 40:3-6; *see* Ex. 13, Wirthlin Dec. at ¶¶ 58 and 59. This contradictory statement made by Aten's expert shows that Aten cannot reasonably maintain that

---

[7] If Aten's argument that it's impossible for the invention of the '287 and '217 patents to perform synchronous switching without interruption of the data flow or signal to the peripheral device, then Aten misrepresented the technology described and claimed in these patents when it provided its "simple example" that showed how its invention allowed synchronous switching of console devices and a printer without interruption of the data stream to the printer. Or, if not misrepresented, the claims are indefinite.

"the data stream coming from first computer 121 at the time of the switching is left unaffected"
means that the data has already been transferred to the printer, and that therefore there is no
stream to be interrupted in synchronous switching. Judge Guilford addressed this issue stating
"this argument is directly refuted by the prosecution history.  In their Office Response, Plaintiffs
clearly discuss synchronous switching without interruption of data flow [citing page 14]." Ex. 7,
CDCA Construction Order at 13.  Aten's expert also stated that a person of ordinary skill in the
art would understand that "[s]pooling in general refers to storing data for subsequent processing.
In general, spooling may occur on a computer." Ex. 12, Narad depo., 40:18-41:13. Ultimately,
the expert waffled, concluding that spooling can take place on the computer or on the printer,
further degrading Aten's position. *Id.*

Aten's expert finally admitted that Aten has backed into its construction of this term after
first coming to the conclusion, without reference to the patent, that synchronous switching
cannot be performed without interruption to the data flow.  This approach is contrary to
principles of claim construction, and should not be countenanced.

> Q. If you had not already come to the conclusion that synchronous switching cannot be
> done without interruption of the signal to one or more than one peripheral device, and
> you were to read this paragraph, is there anything in here that leads you to come to the
> same conclusion other than your outside knowledge that synchronous switching can't be
> done without interruption?
> A. No.

Ex. 12, Narad Tr. 25:19-26:3. In sum, Aten's citation to the prosecution history, hurts, rather
than helps its position.  Defendants' construction is a more proper reading of the patent and
should be adopted.

>    2.    *Means Plus Function Limitations of the '287 and '217 patents*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "means for switching the selected console | The structure(s) recited on lines 5:1-41, and the | **FUNCTION**<br>Switching, both synchronously and asynchronously, the selected console device between the first channel and |

| | | |
|---|---|---|
| device between the first channel and the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device" | corresponding portions of Fig. 4, of the '287 Patent. | the third channel without interruption of the data flow through the second channel between the first selected computer system and the selected peripheral device.<br>**STRUCTURE**<br>A USB hub switch module 32, a USB device control module 38, and a CPU 30 that is programmed with firmware performing at least the algorithm set forth in Fig. 5 of the specification.<br>The USB hub switch module is a bridge between peripheral devices and computer systems that switches signals from the computer systems to the peripheral devices, and for passing the signals from the emulated console devices from the device control module to the computer systems.<br>The USB device control module is one or more device chips that run emulation programs to emulate the console devices.<br>The USB hub switch module and the USB device control module are controlled by firmware on the CPU (i.e., an algorithm running in the CPU) that performs all of the steps set forth in Figure 5, as well as other steps to execute the switching (however, the algorithm for these other steps is not disclosed). |
| "means for switching the selected console device between the first channel and the third channel without changing the second channel between the first selected computer system and the selected peripheral device." | The structure(s) recited on lines 4:64 – 5:36, and the corresponding portions of Fig. 4, of the '217 Patent. | **FUNCTION:**<br>Switching, both synchronously and asynchronously, the selected console device between the first channel and the third channel without changing the second channel between the first selected computer system and the selected peripheral device.<br>**STRUCTURE:**<br>A USB hub switch module **32**, a USB device control module **38**, and a CPU **30** that is programmed with firmware performing at least the algorithm set forth in Fig. 5 of the specification.<br>The USB hub switch module is a bridge between peripheral devices and computer systems that switches signals from the computer systems to the peripheral devices, and for passing the signals from the emulated console devices from the device control module to the computer systems.<br>The USB device control module is one or more device chips that run emulation programs to emulate the console devices.<br>    The USB hub switch module and the USB device control module that are controlled by firmware on the CPU (i.e., an algorithm running in the CPU) that |

| | | performs all of the steps set forth in Figure 5, as well as other steps to execute the switching (however, the algorithm for these other steps is not disclosed). |
|---|---|---|

These terms are found in claims 7 of the '287 patent and claims 5, 6, and 7 of the '217 patent. Defendants agree with Aten that these terms are "means-plus-function" limitations governed by 35 U.S.C. § 112 ¶6. The main difference between the parties' constructions of the functions of these claims is that Defendants' proposed construction requires that "means for switching" include both synchronously and asynchronously switching of console devices and peripheral devices without interruption of the signal flow through the second channel, while Aten's proposed construction limits it to just asynchronous switching.

As discussed above, every embodiment of the '287 patent requires that both synchronous and asynchronous switching of console devices and peripherals happens without interruption. No words in claim 7 of the '287 patent and claims 5, 6, and 7 of the '217 patent limit the switching to either synchronous or asynchronous switching.[8]  The claim language itself does not limit this

---

[8] The '217 patent is a continuation of a continuation of the '287 patent and therefore, shares a common specification. The '271 includes four independent claims (1, 5, 6 and 7) patentably indistinct from the claims of the '287 patent.  The prosecution history of the '217 patent consists of only one Office Action, given by the same Examiner of the '287 patent, rejecting all of the claims under nonstatutory double patenting as being not patentably distinct from the claims of the '287 patent. Ex. 4, '217 Pros. His. At ATEN000411-419.  The Examiner stated that even though the last section of claim 1 of the '217 application was not identically recited in the '287 patent, "elements of claim 1 of the present application still perform the same functions . . . as claims 1-4 of the ['287] patent." *Id.* at 3-4.  The other claims of the '217 application were likewise rejected as being obvious variants of claims of the '287 patent. *Id.*  In its May 28, 2008 Response and Amendment, Aten acknowledged the Examiner's position by failing to traverse it and by filing a terminal disclaimer. *Id.* at ATEN0000357-363. Accordingly, the '217 patent, which Aten has acknowledged recites only elements which "still perform the same functions" of the claims of the '287 patent, should be subject to the same construction with respect to synchronous and asynchronous switching functions as the claims of the '287 patent. *See Elkay Manufacturing v. Ebco Manufacturing*, 192 F.3d 973 (Fed. Cir. 1999) ("[w]hen multiple patents derive from the same initial application , the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."); *see also Hakim v. Cannon Avent Group*, 479 F.3d 1313 (Fed. Cir. 2007); *and Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004)).

to either synchronous or asynchronous switching. The language refers only to switching the console device from a first channel to a third channel without interrupting data flow through the second channel or "without changing the second channel between the first selected computer system and the selected peripheral device." Nowhere in the claims is language that would limit this to only asynchronous switching. Aten's citation to the specification, '287 patent 3:42-44, actually speaks to both types of switching: "[i]n other words, the KVM channels and peripheral channels may be switched together (synchronously) or separately (asynchronously)." '287 patent 3:42-44.

Although language discussing both synchronous and asynchronous switching is not explicitly recited in these claims, the prosecution history clearly shows that this limitation is required. Ex. 13, Wirthlin Dec. at ¶¶ 76-77. Aten completely avoids any discussion of the prosecution history.  During the prosecution of the '287 patent, when faced with the PTO's rejection that claim 7 was obvious in view of the same Dickens and Thomas prior art, Aten specifically argued that, much like claim 1, claim 7 concerns a "switch wherein the console devices can be switched synchronously with peripherals, without interruption of the signal to the peripheral devices." Ex. 3, at ATEN0004359 (emphasis added). Aten argued only that it is "synchronous" switching that is done without interruption. It is also important to note that in overcoming this rejection, Aten largely adopted the arguments it made to support the non-obviousness of claim 1. In the "Reasons for Allowance" the Examiner stated:

> [t]he instant application is deemed to be directed to an unobvious improvement over [Thomas and Dickens]. The improvement features … a plurality of console devices … and one or more than one peripheral device in any of a plurality of computer system include a console device can be switched either synchronously or asynchronously with one or more than one peripheral device to the same one of the plurality of computer

---

Aten's expert agreed that the terms in the '287 and '217 patents have the same meaning, and that the arguments made by the applicant of the '287 patent are the only arguments made regarding asynchronous and synchronous switching.  Ex.12, Narad Tr. 71:12-16.

system or to different ones of the plurality of computer systems, without interruption of the signal to one ore [sic] more than one peripheral device (claims 1 and 7).

Ex. 3, at ATEN0004334. Aten should not now be allowed to argue that the "means for switching" does not require synchronous switching without interruption of signals to the peripheral devices when it specifically represented to the PTO that it was "synchronous" switching "without interruption" that distinguished the "means for switching" limitation from the prior art. *Springs*, 323 F.3d at 995; *Vitronics*, 90 F.3d at 1583; *Southwall*, 54 F.3d at 1576.

As to the corresponding structure, Defendants' proposed identification is included in the specification sections cited by Aten. Therefore, Defendants can agree with Aten's proposed structure that it includes all structure identified in the '287 patent at 5:1-41, the '217 patent at 4:64 – 5:36, and the corresponding portions of Fig. 4. Alternatively, Defendants can accept the corresponding structure adopted by Judge Guilford.

3.      *"repeatedly polling", "enumerate", and "management program"*

| Term | Aten's Proposal | Defendants' Proposal |
|------|-----------------|----------------------|
| "repeatedly polling" | PAOM | "A polling event/sequence that is performed on a continuous, repeated basis." |
| "enumerate" | PAOM | "Standard USB enumeration, i.e., the activity that identifies and assigns unique addresses to devices attached to a bus" |
| "management program" | PAOM | "A program stored on memory of the CPU to manage the signal switch that performs each of the following steps: (1) Initializing the signal switch; (2) Enumerating a root hub; (3) Detect devices on root hub; (4) Enumerate devices detected on root hub; (5) Detect downstream hubs; (6) Enumerate the downstream hubs; (7) Detect existing devices in the downstream hubs; (8) Enumerate the existing devices in the downstream hubs; (9) Determine whether the connected device is a HID keyboard or mouse or other HID compliant device; (10) Enumerate each HID compliant device and parse any report data; (11) Poll the hub switch module; (12) Determine whether any downstream port is unplugged or plugged; (13) If a downstream port is unplugged or plugged the process proceeds to the beginning where the host control RAM is reset; (14) If the downstream ports are not unplugged, the KVM devices are polled; and (15) After resetting the host control RAM the process returns to the enumeration of the |

|  |  | root hub." |
|---|---|---|

        a)      "repeatedly polling"

The term "repeatedly polling" as used in the claims and in the context of the specification would be understood by one of ordinary skill in the art to mean a polling event/sequence that is performed on a continuous, repeated basis. Ex. 13, Wirthlin Dec. at ¶¶ 64-68.  The specification states with respect to this term:

> Control then passes to step 226 where the HUB switch module 32 is polled. In optional step 234 any panel or LED circuit is polled. In step 238 it is determined whether any downstream port is unplugged or plugged. If the downstream port is unplugged or plugged the process proceeds to step 240 where the HOST control RAM is reset. After resetting the HOST control RAM in step 240 the process returns to step 212. Else, the process proceeds to step 242 where the KVM devices are polled and the process returns to step 234.

'287 at 6:62 – 7:4. This passage references Figure 5 which shows that the "repeatedly polling" is done on a continuous and repeated basis. Defendants' proposed construction should be adopted as it accurately reflects the invention as disclosed. Ex. 13, Wirthlin Dec. at ¶68.

        b)      "enumerate"

Same response as Section A(1).

        c)      "management program"

Although the words making up the term "management" and "program" have well understood meanings, without the context of the specification and prosecution history these terms are vague and do not convey how such a "program" would "manage" the "signal switch" of the claimed invention. Ex. 13, Wirthlin Dec. at ¶¶ 70-73. As Aten points out in its Opening Brief, the specification devotes nearly a full patent column to describing the claimed program that manages the claimed signal switch. '287 6:19 – 7:4. Additionally, such a specific "management program" is of such importance that entire Figure 5 of the specification is devoted to explaining exactly what constitutes this claim limitation. '287 Fig. 5.  In order to more

19

reasonably limit the meaning of "management program," Aten's expert testified that management program as recited in Claim 1 comprises at least the limitations for managing the signal switch and the method of claim 5. Ex. 12, Narad Tr. At 66:1-67:18.

During prosecution, the Examiner rejected Claim 5, in part, because the prior art disclosed a "*management program for managing* the signal switch," the very element construed in the very way Aten now proposes.[9] Ex. 3, Pros. His. '287 at ATEN0004365 (emphasis added). In its April 6, 2005 Response and Amendment, Aten stated that it is the specific "management program" disclosed in the specification that sets claim 5 apart. *Id*. at  ATEN0004357-4358. Aten could not have been clearer: "that [] claim [5] is drawn to the process of a portion of a management program 42 suitable for use in the present invention. *See* Figure 5, ¶¶0041-0446. This is not present in Thomas, et al. or Dickens et al." *Id*.[10] *See Springs*, 323 F.3d at 995. For Aten to simply say that this term is a program for managing makes this term at least indefinite and/or the claim obvious.

      4.     *"host control module*

| Term | Aten's Proposal | Defendants' Proposal |
|------|-----------------|----------------------|
| "host control module" | PAOM | "A hub configured to communicate with a plurality of console devices and connected to the CPU." |

With this term, as with many other terms of the '287 patent, Aten's present proposed construction of PAOM is inconsistent with it previous claim construction positions in the *Emine* litigation. Ex. 14, March 29, 2011 letter. Previously, Aten proposed that this term should be construed to mean a "device configured to communicate with one or more keyboard and/or

---

[9] Aten states, "[i]n this context, it is a program for managing the switch that comprises at least the method of claim 5." Opening Brief at 15.

[10] The cited paragraphs 0041-0046 of the application correlate identically to the '287 patent at 6:19 – 7:4 with the exception of the first paragraph of this section '287 patent 6:19-27.

mouse devices." *Id*. This belies Aten's argument that this term does not need to be construed.[11]
This inconsistency in its claim construction positions required that Defendants attempt to pin
down the meaning of this term. Defendants' construction does this and should be adopted.

     5.      *"device control module"*

| Term | Aten's Proposal | Defendants' Proposal |
|------|-----------------|----------------------|
| "device control module" | PAOM | "Device chips that are directly connected to the hub switch module, that run emulation programs to emulate the console devices, and that are controlled by CPU firmware." |

     This term is yet another term that Aten's present proposed construction of PAOM is
inconsistent with it previous positions in the *Emine* litigation. Ex. 14, March 29, 2011 letter. In
that litigation, the CDCA construed the term "device control module" as "device chips that are
used to emulate the console devices," explaining that the specification clearly discloses this
construction. Ex. 7, CDCA Construction Order at 24, *citing* '287 patent 5:16-20.  This is
consistent and supports Defendants' proposed construction.

     6.      *"hub switch module;" and "such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer"*

| Term | Aten's Proposal | Defendants' Proposal |
|------|-----------------|----------------------|
| "hub switch module" | PAOM; or, in the alternative, "bridge between at least one or more peripheral devices and one or more computers" | "A bridge between peripheral devices and computers systems that switches signals from the computer system to the peripheral devices, and that passes the signals for the emulated console devices from the directly connected device control module." |
| "such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination | PAOM; In the alternative, "such that a signal passing from the hub switch module to the one or more than one peripheral device appears as originating from a computer" | "The signal passing from the hub switch module to the peripheral device imitates the signal originating from the computer system." |

---

[11] "A claim term cannot have different meaning at different times; its meaning must be
interpreted as of its effective filing date." *PC Connector v. SmartDisk*, 406 F.3d 1359, 1361
(Fed. Cir. 2005).

| from a computer" | | |
| --- | --- | --- |

Aten's claim construction position as to these terms has also been a moving target. In its PR 4-1 disclosure, it did not identify these terms as needing construction. Ex.1, Aten's PR 4-1. In its PR 4-2 disclosure it simply stated that these terms should be given their "plain and ordinary meaning" without any additional explanation. Exs. 1 and 2, Aten's PR 4-1 and 4-2. In the *Emine* litigation, however, Aten indicated that these same terms needed construction. Ex. 14, March 18 and 29, 2011 Aten letters. In its Construction Order, the CDCA noted "[t]he parties agree that 'hub switch module' has no accepted meaning to a person of ordinary skill in the art …." Ex. 7, CDCA Construction Order at 15.

a)      "hub switch module"

The only critique that Aten raises with Defendants' construction of this term is that it uses the word "direct." Use of the word "direct" in Defendants' proposed construction is consistent with the claim language and the specification and, therefore, should be adopted.  *See* '287 patent 5:1-4, 7-9.[12]

b)      "such that a signal passing from the hub switch module to the one or more than one peripheral device emulates origination from a computer"

Same response as Section A(1).

7.      *"emulating one or more of the console devices"*

| Term | Aten's Proposal | Defendants' Proposal |
| --- | --- | --- |
| "emulating one or more of the console devices" | PAOM; In the alternative "appearing as one or more of the console devices" | "Imitating the signal of industry standard console devices to a computer system" |

Same response as Section A(1).

---

[12] Defendants' proposed construction is further more closely aligned with the construction adopted by Judge Guilford in the *Emine* litigation. *See* Ex.7, CDCA Construction Order at 15-17.

22

C.    '141 Patent titled "Resource Sharing Apparatus Which Disconnects an Input Device When Detecting a Standby Indication of a Switching Command"

As Aten explained, the '141 patent is directed to a "hotkey" switching function. As claimed, explained in the specification, and distinguished from the prior art during prosecution, the invention of the '141 "hotkey" switching invention requires a "special handling method." The '141 specification provides a detailed example of the "problem found by the inventors" and is alleged to be resolved by the claims of the '141 patent:

> FIG. 1 schematically shows an embodiment of a resource sharing apparatus for sharing a keyboard with several hosts. This is not prior art for the purposes for determining the patentability of the invention and [] merely shows a problem found by the inventors. As shown in FIG. 1, resource sharing apparatus 100 is coupled between a keyboard KB and hosts H1 and H2. The keyboard KB is switched to be connected to and interact with the host H1 or H2 according to a switching command from the keyboard KB. For example, the switching command can be a series of keystrokes, such as Ctrl+Ctrl+1 or Ctrl+Ctrl+2. Assuming that at first the host H1 is coupled to the keyboard KB through the multiplexer M0, when a series of keystrokes of Ctrl+Ctrl is detected by a monitoring unit 10, the monitoring unit 10 enters a standby mode to wait for a number identifying host H1 or H2 is to be switched to inactive with the keyboard KB. Because the host H1 is still coupled to the keyboard KB when the keyboard KB inputs the number 1 or 2 to the resource sharing apparatus 100, the number 1 or 2, i.e., the rest of the switching command for the resource sharing apparatus 100, may serve as input data and be transferred to the host H1 and/or a malfunction operation may be executed, and vice versa.

'141 patent 2:33-50 (emphasis added). As described, the problem the claimed invention is seeking to solve arises "[b]ecause the host H1 is still coupled [or has a direct communication pathway] to the keyboard KB" so that when the "rest of the switching command," *i.e.*, "the number 1 or 2," is entered, it is sent or "transferred to the host which causes a malfunction operation …." The '141 invention solves this problem by "disconnecting" this "coupling":

> For example, when an input signal comprises the standby indication of the switching command, the monitoring unit 230 outputs a first signal to the control unit 210. When receiving the first signal, the control unit 210 enables the multiplexer M2/M3 to disconnect the host H1/H2 from the input device 50, and further establishes a connection between the host H1/H2 and the emulator 220A/220B and to enter a standby mode. When a second input signal comprises an identifier identifying one of the first and the second hosts, the monitoring unit 230 outputs a second signal to the control unit 210 accordingly,

such that the control unit 210 establishes a connection between the selected host and the input device 50.

'141 patent 3:55-67; Ex. 13, Wirthlin Dec. at ¶¶ 79-90.

The prosecution history further supports Defendants' constructions. In its January 16, 2012 office action response to overcome the Examiner's anticipation rejection, Aten argued that the solution to solving this problem is through:

> a fundamental difference in comparison to the teaching of [the prior art] with regard to the concepts of "connected" and "disconnected" between the input device and the host devices. In the present invention method, a determination (of whether an input signal has a standby indication) is done while the input device and the host are connected, and only after such determination is made, the input device is disconnected from the host and replaced with an emulator. To the contrary, in [the prior art], no such determination is made while the input device is connected to the host, and the disconnection of the input device from the host is not made in response to such determination.

Ex. 5, Pros. His. of '141 patent at ATEN0000131-143. Aten further distinguished the '141 invention explaining:

> However, the inventor discovered a potential problem with such switching command. If such keystrokes are used as switching command without the special handling method described and claimed in the instant application, undesirable result may occur. Without the special handling method, the resource sharing apparatus would keep the host H1 connected while waiting for the entire switching command Ctrl+Ctrl=2 to be received, and at the time, disconnect host H1 and connect host H2. The potential problem with this method is discussed in paragraph [0018]: 'Because the host H1 is still coupled to the keyboard KB when the keyboard KB inputs the number 1 or 2 to the resource sharing apparatus 100, the number 1 or 2, i.e., the rest of the switching command for the resource sharing apparatus 100, may serve as input data and be transferred to the host H1 and/or a malfunction operation may be executed …'

*Id*. at ATEN0000131-143. Aten then immediately explained:

> Accordingly, the switching command (e.g. Ctrl+Ctrl+2) is handled in a two-step process. In the first step, after receiving the standby indication part of the switching command (e.g. Ctrl+Ctrl), the resource sharing apparatus disconnects the currently connected host (e.g. H1). At this time, no host is connected to the resource sharing apparatus, and therefore, the identifier part of the switching command (e.g. "2") will not be inadvertently transmitted to the host H1. Then when the identifier part of the switching command is received, the resource sharing apparatus connects the new host which is identified by the identifier.

*Id*. at ATEN0000131-143 (emphasis added). The '141 claims were allowed over the prior art

because of this "special handling method." Defendants' proposed constructions are in line with

the claim language, specification and prosecution history and should be adopted.

      1.     *"standby indication" and "determining whether the first input signal comprises a standby indication of a switch command"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "standby indication" | PAOM | "An input signal that directs the breaking of the direct communication pathway between the input device and host and then the connecting of the host to the emulator" |
| "determining whether the first input signal comprises a standby indication of a switch command" | PAOM | "The monitor actively observing the signals from the input device to detect that the connection between the input device and the host may be changed" |

      a)     "standby indication"

The claim language supports Defendants' proposed construction by describing this term

as "wherein the standby indication is for indicating that connection between the input device and

the first host can be changed…." Claim 1. The specification further supports Defendants'

proposed construction: "[t]he input device is disconnected from the first host when the first input

signal includes the standby indication, and the input device is emulated to the first host. '141

1:39-42; *see also* 1:39-42, 1:43-51, 1:65 – 2:2, 3:4-16, 3:50-63, 4:1-7, 4:30-39, 6:13-21, 7:1-22,

7:23-29, 8:36-45, and Figures 2-5; Ex.13, Wirthlin Dec. at ¶¶ 79-81. As explained above, the

prosecution history also supports Defendants' construction through its treatment of the '141

patent's "special handling method."

      b)     "determining whether the first input signal comprises a standby indication of a switch command"

The specification support Defendants' construction explaining that "[t]he monitoring unit

230 is coupled between the input device 50 and the control unit 210, acquires signals from the

host H1/H2 and the input device 50, <u>decodes</u> the acquired signals and outputs corresponding

signals (interrupts) to the control unit 210 . . . ." '141 3:50-63 (emphasis added).

      2.    *"disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host" and "wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host" | PAOM | "Breaking the direct communication pathway between the input device and the host and then establishing a direct communication pathway between the host and the emulator" |
| "wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus" | PAOM | "The second input signal is not transferred to any of the hosts because there is no direct communication pathway from the input device to any host when the second input signal is received by the resource sharing apparatus" |

        The "special handling method" of the '141 patent requires that "no host is connected to

the resource sharing apparatus, and therefore, the identifier part of the switching command (e.g.

"2") will not be inadvertently transmitted to the host H1." To ensure that the identifier part of the

switching command "will not be inadvertently transmitted," the host is disconnected from the

resource sharing apparatus. Defendants' proposed constructions for these terms reflect this

special handling method and therefore should be adopted.

      3.    *"monitor"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "monitor" | PAOM | "A unit such as a CPU or integrated circuit that actively observes signals from the input device and (1) identifies any standby indications in those signals, in response to which it sends a first output signal to the control unit directing the disconnect of the presently connected host from the input device, and then (2) identifies any identifier signals, in response to which it sends a second output signal to the control unit directing the control unit to establish a connection between the selected host and the input device." |

Aten provides no explanation why this "[t]he term 'monitor' is clear and does not require construction." Opening Brief at 24; Ex. 13, Wirthlin Dec. at ¶¶ 94-98. Defendants' proposed construction is consistent with the common usage of this term in the field and described in the specification. *Id*. Monitor is defined in the Computer Science and Communications Dictionary, Vol. 1, Martin Reik (ed.) as:

> 2. Software or hardware that is used to scruitinize and then display, record, supervise, control, or verify the operations of a system, such as a computer system or a transmission system…. 3. Software, hardware, or firmware that observes, tracks, traces, supervises, controls, or verifies the operations of a system."

Ex. 17, UNI0002355-56. The specification also supports Defendants' construction, describing:

> "[t]he monitoring unit 230 is coupled between the input device 50 and the control unit 210, acquires signals form the host H1/H2 and the input device 50, decodes the acquired signals and outputs corresponding signals (interrupts) to the control unit 210, such that the control unit 210 executes some predetermined resource sharing operations accordingly. For example, when an input signal comprises the standby indication of the switching command, the monitoring unit 230 outputs a first signal to the control unit 210.

'141 patent 3:50-58. Further, as discussed above, Defendants' construction is also supported by the prosecution history and the "special handling method." Ex. 5, Pros. His. '141 ATEN0000131-143. Defendants' construction provides clarity and should be adopted.

4.    *"connect" and "disconnect"*

| Term | Aten's Proposal | Defendants' Proposal |
|------|-----------------|----------------------|
| "connect" | PAOM | **Connection:** "a direct communication pathway between the input device or device emulator and host"<br>**Connected:** "a state of communication through a direct pathway between the input device and host"<br>**Connecting:** "Establishing a direct communication pathway between the input device or device emulator and host" |
| "disconnect" | PAOM | **Disconnect:** "To break the direct communication pathway between the input device or device emulator and host"<br>**Disconnecting:** "Breaking the direct communication pathway between the input device or device emulator and host" |

Again, Aten provides no explanation for these terms or how the PAOM of these terms relate to the claimed "special handling method" argued for during prosecution. The "special

27

handling method" of the '141 patent requires that "no host is connected to the resource sharing apparatus, and therefore, the identifier part of the switching command (e.g. "2") will not be inadvertently transmitted to the host H1." To ensure that the identifier part of the switching command is not inadvertently transmitted, the host is disconnected from the resource sharing apparatus. Defendants' proposed constructions for "connect" and "disconnect" reflect this special handling method and should be adopted.

**D.    '275 Patent titled "Electronic Switching Device for a Universal Serial Buss Interface"**

Dependent claim 45 is the only asserted claim of the '275 patent. Claim 45 was not original to the '275 patent but only appeared in the March 26, 2013 *Inter Partes* Reexamination Certificate. Claim 45, however, was erroneously printed on the *Inter Partes* Reexamination Certificate by the USPTO through a clerical error as will be shown. On November 19, 2010, the Examiner entered an Action Closing Prosecution ("ACP"). On December 20, 2010, Aten first proposed claim 45 in an amendment (numbered as claim 71). Ex. 6, '275 Reexam at ATEN0001509-1543. On April 12, 2011, the Examiner in the Right to Appeal Notice specifically stated that Aten's December 20, 2010 "amendment is <u>not entered</u>" as it clearly violated 35 C.F.R. §§1.951, 1.116 and Manual of Patent Examining Procedure §2637[13]. *Id*. at ATEN0001465-73. In its May 12, 2011 Notice of Appeal, Aten did not include claim 45/71, and the Patent Trial and Appeal Board also did not review this claim in its September 25, 2012 Decision on Appeal. *Id*. at ATEN0001461-64, and ATEN0001022-43. Also, claim 45/71 was not included in the Notice of Intent to Issue *Inter Partes* Reexamination Certificate. *Id*. at ATEN0001014-16. Although never entered, examined or reviewed by either the Examiner or the

---

[13]"It should be kept in mind that a patent owner cannot, as a matter of right, amend claims rejected in the ACP, add new claims after an ACP, nor reinstate previously canceled claims." Manual of Patent Examining Procedure §2637.

PTAB, claim 45/71 was somehow included in the March 26, 2013 *Inter Partes* Reexamination Certificate. This clerical error renders claim 45 unenforceable. *See H-W Technology, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014) (an erroneously issued claim is unenforceable because "[t]o hold otherwise would potentially permit patentees to assert claims that they never asked for nor rightly attained.  Such a result would be inequitable and undermine the notice function of patents."). Although this claim should not be at issue Defendants provide the following constructions out of an abundance of caution.

1.   *"wherein the input of the control signal generator consists of the connection to the output of the trigger signal generator" and "for receiving only the trigger signal outputted from the trigger signal generator"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "wherein the input of the control signal generator consists of the connection to the output of the trigger signal generator" | PAOM | "The only input of the control signal generator is from the trigger signal generator." |
| "for receiving only the trigger signal outputted from the trigger signal generator" | PAOM | "The only signal received by the control signal generator is the trigger signal outputted from the trigger signal generator." |

The use of the term "consists" is a transitional phrase that has special meaning in claim drafting. "The transitional phrase[] … 'consisting of' define[s] the scope of a claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim." MPEP 2111.03. "When the phrase 'consists of' appears in a clause of the body of a claim, rather than immediately following the preamble, it limits only the element set forth in that clause; other elements are not excluded from the claim as a whole." *See Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279 (Fed. Cir. 1986). These terms use negative claim limitations and render the claims indefinite and/or inoperative unless construed as proposed by Defendants. Therefore, the use of the terms "consists" and "only" requires that "the

only input of the control signal generator is from the trigger signal generator" and that "the only signal received by the control signal generator is the trigger signal outputted from the trigger signal generator."

    2.    *"connector"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "connector" | PAOM | "A multiplexor with an input and an output being connected with the USB interfaces of different electronic devices and a selecting signal being connected to the output of the control signal generator." |

Same response as Section A(1).

    3.    *"trigger signal generator;" and "control signal generator"*

| Term | Aten's Proposal | Defendants' Proposal |
|---|---|---|
| "trigger signal generator" | PAOM | "A hardware circuit that generates a signal to the control signal generator in response to a user interaction, wherein the hardware circuit is made up of a resistor, a capacitor, and a switch" |
| "control signal generator" | PAOM | "Control signal generator: (1) is a circuit such as a D FLIP-FLOP; (2) the only input to the control signal generator is from the trigger signal generator; (3) the only signal received by the control signal generator is the trigger signal, (4) processing the trigger signal by the D FLIP-FLOP to create a control signal; and (5) transmitting the processed signal through an output connected with the input selecting signal of the connector." |

Defendants' proposed constructions should be adopted for these terms as they are consistent with the only disclosure provided in the specification and would be understood by one of ordinary skill in the art viewing these terms in the context of the claims, specification, and prosecution history.

## III.   CONCLUSION

For at least the foregoing reasons, and those set out in the Declaration of Michael Wirthlin, Ph.D, Defendants respectfully request that the Court adopt its proposed constructions and reject Aten's.

DATED this 29th day of May, 2015.

Respectfully submitted,

PIA ANDERSON DORIUS REYNARD MOSS

By _/s/ Joseph G. Pia_____

Eric C. Wood
Texas State Bar No. 24037737
SCHEEF & STONE, L.L.P.
2600 Network Blvd., Suite 400
Frisco, Texas 75034
(214) 472-2100 Phone
(214) 472-2150 Fax
eric.wood@solidcounsel.com

Robert E. Aycock (Admitted *Pro Hac Vice*)
Utah State Bar No. 8878
raycock@padrm.com
Joseph G. Pia (Admitted *Pro Hac Vice*)
Utah State Bar No. 8878
Joe.pia@padrm.com
222 South Main Street, Suite 1830
Salt Lake City, UT  84111
(801) 350-9000

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing is being served on counsel of record via email on May 29, 2015.

*/s/ Joseph G. Pia*
Robert E. Aycock