

                                        Joseph G. Pia
                                        Joe.pia@pa-law.com
                                        Robert E. Aycock
                                        RAycock@pa-law.com

## NOTICE AND DEMAND

August 31, 2017

*Sent Via Email*

Lei Mei
P. Andrew Riley
MEI & MARK
818 18th Street NW #410
Washington, DC 20006
mei@meimark.com
ariley@meimark.com

        Re:    *ATEN International Co. Ltd. v. Uniclass Technology Co. Ltd., et al.*
                – *Defendants' Counteroffer*

Messrs. Mei and Riley,

    A.   **OFFER HISTORY AND DEFENDANTS' COUNTER OFFER**

        Just over a year ago, the parties participated in Court ordered mediation conducted by Bill Thomson. The parties could not settle at that time because ATEN would not consider a settlement for less than $8 million USD, a figure that Defendants could not agree to as it was unsupported by the facts or ATEN's infringement theories. Since then, Defendants' assessment of ATEN's mediation offer has proved accurate as more than 70% of ATEN's claims have been dismissed or withdrawn, the Court has rejected ATEN's lost profits claim and places little weight in ATEN's current reasonable royalty theory.

On March 10, 2017, Uniclass and the other Defendants made a further attempt to settle the parties' disputes and to avoid the unnecessary costs of further litigation and trial by offering to (1) pay ATEN $50,000; (2) to no longer seek to invalidate the patents and to dismiss their counterclaims; (3) have mutual global releases and a walk away in the U.S., Taiwan, and China; (4) vacate the $6M NTD judgment; (5) drop their claims for reimbursement of costs and fees in defending this action under 35 U.S.C. § 285; (6) withdraw their claims that ATEN made misstatements during the prosecution of the '275 patent; and, (7) agree to vacate the claim construction Order, and/or not oppose ATEN's appeal of that Order.

On May 4, 2017, ATEN provided a counteroffer of (1) $2.1M; (2) a permanent injunction on the remaining accused products; (3) an injunction on the products that were stricken as a part of the March 13, 2017 order; (4) an agreement by ATEN to dismiss this action and covenant not to bring future lawsuits on the stricken products or otherwise; and (5) that this settlement only pertains to ATEN's U.S. claims. Again, Defendants could not accept this counteroffer as it asks for more than ATEN's best outcome at trial.

There have been no subsequent settlement offers. However, Defendants would again like resolve this dispute short of trial to conserve the resources of the parties, the Court and the jury. To that end, Defendants extend the following settlement offer for your consideration.

<u>Defendants shall</u>:

1. waive and release ATEN from over $2M USD in Defendants' fees and costs under 35 U.S.C. § 285;

2. pay ATEN $150,000 USD for a paid in full license on products (three times Uniclass's last offer, double StarTech's license fee);

3. no longer seek to invalidate the patents and dismiss their counterclaims;

4. mutual global releases and a walk away, including the U.S., Taiwan, and China;

5. vacate the $6M NTD ($198,820.38 USD) judgment;

6. withdraw any claims that Aten made misstatements during prosecution of the '275 patent;

7. vacate the claim construction Order, or will not oppose ATEN's appeal of that Order;

8. agree to a mutual, confidential, no admission, general release of known and unknown claims.

We hope that you and your client appreciate the efforts and concessions that have gone into making this counter offer and consider this offer in good faith. What follows is a brief summary providing context and examples for the bases of Defendants' current counter offer.

### B. ATEN'S DAMAGES CASE IS WEAK AND AT MOST IS WORTH $517,683 IF IT WINS EVERYTHING AT TRIAL

   a. The Court Dismissed ATEN's Lost Profits Claim

On April 24, 2017, the Court granted partial summary judgment as to ATEN's claim for lost profits, substantially weakening its ability to get damages at trial. [Dkt. No. 363.] The Court stated that "there are multiple layers of guesswork in Snell's analysis." (*Id*. at 5 emphasis added). The Court continued on page 6:

> ATEN has not met its burden to provide a basis for concluding that any sales of Defendants would be sales of ATEN in the "but for" market. . . . In sum, Snell testifies to no factual basis for concluding that ATEN would have made Uniclass's sales in a multi-competitor market where he admits there is a dearth of factual data. Accordingly, ATEN cannot meet the reasonable probability standard for establishing lost profits.

   b. ATEN is Left with a Small Reasonable Royalty Claim

After the dismissal of the lost profits claim, ATEN's only hope for recovery is through a reasonable royalty claim. Although the analysis for lost profits differs from the reasonable royalty analysis, the unreliability apparent in Mr. Snell's lost profits analysis permeates his reasonable royalty analysis. Because of the flaws in Mr. Snell's analysis, Uniclass filed a further motion to preclude Mr. Snell from testifying at trial as to reasonable royalties [Dkt. No. 391.] During the hearing on that motion, the Court remarked that the weaknesses of Mr. Snell's testimony made him ripe for cross examination at trial and that it was a very close call for the Court to strike Mr. Snell's testimony completely, and exclude him from trial. The parties filed a Pre-Trial Order. [Dkt. No. 394.] Page 20 contains a summary of what Uniclass will present to the jury at trial as to the damages claim, copied here:

   I.   **ATEN's Position on Damages**

ATEN's total reasonable royalty only amounts to **$682,382** for all thirty-four (34) accused product sales through July 15, 2016. However, the Prima T products must be removed from this calculation because they have never been sold in the U.S. ATEN's revised total is **$517,683**.

******

## II. Defendants' Position on Damages

Conversely, under Defendants' damages expert's reasonable royalty calculation for all of ATEN's thirty-four (34) accused product sales, the total damages amount is only **$87,542** for sales through July 15, 2016.

When the Prima T product line is removed because these products were only sold outside of the U.S., this amount decreases to **$65,546**.

And again, the total royalty amount is even less when only the seven (7) permissible accused products are considered. See Uniclass' table of Patents and Claims and Accused

******

Furthermore, ATEN has not presented or identified any evidence that Defendants, other than Uniclass, are susceptible to liability apart from Uniclass' alleged infringement. If the above reasonable royalty were paid, then the other Defendants would owe nothing as a single royalty per product may be attributed to each sale under patent exhaustion. As such, these other defendants should be dismissed [at trial] . . . .

At the total damage calculations presented under either ATEN's theory or Defendants' theory, this case is ripe for settlement. However, ATEN insists upon injunctive relief and a settlement in the amount of its potentially highest, and impossible-to-prove, damages amount at trial, and treble damages. ATEN further appears to believe that it will reverse the Court's ruling on the Motion to Strike on appeal, and that all originally accused products should be assessed a royalty. Therefore, the parties have been unable to settle.

[Dkt. No. 394 at 20.] This information has been presented preliminarily to the Court, and will be heavily emphasized in a fees and costs motion, and as applicable at trial. ATEN will not be able to save Mr. Snell's credibility at trial for at least the following reasons:

- Regarding Mr. Snell's lost profits analysis that was stricken:
    - Mr. Snell lacked sufficient data to undertake a market share analysis.
    - Mr. Snell did not undertake an analysis of competitors in the KVM Market and admits that ATEN only sold to a fraction of the market undermining his two-competitor market theory.
    - Mr. Snell invented an alternate theory of product "mapping" to justify a lost profits damage award. The Court explained that this wholly insufficient theory used "multiple layers of guesswork" and "does not embody the use of sound economic principles." [Dkt. 363 at 5.]

- o Mr. Snell's lost profits analysis was incomplete because it failed to recognize the many, acceptable design-arounds as non-infringing substitutes that thwart the second *Panduit* factor.
- o Mr. Snell's lost profits analysis was incomplete because it failed to recognize that Uniclass's sales to ATEN's licensees are acceptable non-infringing substitutes that thwart the second *Panduit* factor.

- Regarding Mr. Snell's reasonable royalty analysis:
  - o Mr. Snell failed to consider two relevant licenses (Belkin and StarTech) in his reasonable royalty analysis without providing a compelling reason for doing so.
  - o Mr. Snell has no basis to maintain a 7.5% royalty opinion based on the ATEN/Uniclass license after two of the three licensed patents from the ATEN/Uniclass license are no longer part of the lawsuit, and the 7.5% was changed to 6.0% the same day.
  - o Mr. Snell did not account for patents that were licensed under ATEN's various license agreements in addition to the cited patents that should have resulted in a royalty dilution.
  - o Mr. Snell did not consider design-around options expressly provided for in the StarTech Agreement
  - o Mr. Snell did not consider the profitability of ATEN's patented products or Uniclass's accused products in arriving at his royalty rate
  - o Mr. Snell did not consider the substantial costs related to litigation and the impact that threats of litigation have on a reasonable royalty rate.

## C.  ATEN'S INFRINGEMENT POSITION WILL NOT PREVAIL AT TRIAL

ATEN has asserted weak infringement positions against Defendants at great expense to itself and to Defendants.  This has been established by the Court through the removal of nearly 70% of ATEN's accused products, and the dismissal of the '275 and '112 patents.

'287 Patent

None of the remaining products accused under the '287 patent infringe, because each product lacks the synchronous claim 1 limitation. ATEN's weak infringement positions regarding the '287 patent stem from Dr. Lavian's failure to correctly apply the Court's construction for the claim term "synchronous and asynchronous switching without interruption" in his analysis of whether the accused products meet the limitations of '287 claim 1. For example, even a cursory visual inspection of the UDV-TA2 accused product shows that it can only connect two computers with a keyboard, mouse, monitor, microphone, speaker. It is impossible to connect this switch to any other peripheral.

'217 Patent

Aten originally accused over 80 products of infringing the claims of the '217 patent. The only remaining product still accused of infringing the claims of the '217 patent is the LKV-248AUSK, which lacks at least "a host control module connected to the CPU and configured to communicate with the plurality of console devices" limitation(s) of claim 1 of the '217 Patent.

'289 Patent

Only three of the 46 products ATEN originally accused of infringing the claims of the '289 patent remain in the case. However, none of the three remaining products infringe the claims of the '289 Patent at least because they do not repeatedly detect whether a first port is occupied to repeatedly determine a master or slave status of the computer switch.

'141 Patent

ATEN's original infringement claim against the LKV-248AUSK prior art invalidates the claims of the '141 patent. The LKV-248AUSK was sold in the United States more than a year before ATEN applied for the '141 patent making the '141 patent invalid under 35 U.S.C. §102 and §103. There is other invalidating prior art, including ATEN's own CS1762 KVM switch.

### D. ATEN IS SUBJECT TO A SECTION 285 AWARD FOR FEES AND COSTS ON ISSUES IT ALREADY LOST IN THE CASE, AND WILL BE SUBJECT TO ALL OF DEFENDANTS' LITIGATION COSTS AT THE CLOSE OF TRIAL

Based on ATEN's and its multiple sets of counsels' unreasonable litigation tactics and behavior in this case, Defendants will seek more than $2 million USD for its costs and attorneys' fees pursuant to 35 U.S.C. § 285; "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *See also Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014). An exceptional case "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id*. Subjective bad faith can be inferred where the patentee deliberately failed to investigate whether a claim element was absent from the accused device. *Kilopass Technology, Inc. v. Sidense Corp.*, 738 F.3d 1302, 1309-12, 1315 (Fed. Cir. 2013).

There is a growing trend for courts to award attorneys' fees and costs to the Defendants in patent infringement suits. *See Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, No. 01-2223, 2015 WL 4941793 (E.D. Pa. Aug. 19, 2015); *Large Audience Display Sys., LLC v. Tennman Prods.,*

*LLC*, No. 2:11-cv-03398-R, slip op. (C.D. Cal. Aug. 18, 2015); *Vehicle Operation Techs. LLC v. Ford Motor Co.*, No. 13-712-RGA, 2015 WL 4036171 (D. Del. July 1, 2015); *Worldwide Home Prods., Inc. v. Bed, Bath & Beyond, Inc.*, No. 11CV3633-LTS-MHD, 2015 WL 1573325 (S.D.N.Y. Apr. 9, 2015); *TechRadium, Inc. v. FirstCall Network, Inc.*, No. 4:13-cv-2487, 2015 WL 862326 (S.D. Tex. Feb. 27, 2015); *TNS Media Research, LLC v. TiVo Research & Analytics, Inc.*, No. 11-cv-4039 (SAS), 2014 WL 5639930 (S.D.N.Y. Nov. 4, 2014); *Pure Fishing, Inc. v. Normark Corp.*, No. 10-cv-2140-CMC, 2014 WL 5474589 (D.S.C. Oct. 28, 2014); *Chalumeau Power Sys. LLC v. Alcatel-Lucent*, No. 11-1175-RGA, 2014 WL 4675002 (D. Del. Sept. 12, 2014) (same); *Summit Data Sys., LLC v. EMC Corp.*, No. 10-749-GMS, 2014 WL 4955689 (D. Del. Sept. 25, 2014); *Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-2066 SI, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) (on remand); *Tech. Innovations, LLC v. Amazon.com, Inc.*, No. 11-690-SLR, 2014 WL 3703582 (D. Del. July 23, 2014); *Cognex Corp. v. Microscan Sys., Inc.*, No. 13-cv-2027, 2014 WL 2989975 (S.D.N.Y. June 30, 2014).

"District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. at 1756; *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014) ("[T]he determination of whether a case is 'exceptional' under § 285 is a matter of discretion."); *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011) ("[W]e are mindful that the district court has lived with the case and the lawyers for an extended period.").

In explaining the "totality of the circumstances" test, the Supreme Court noted with approval the approach to fee awards "under a similar provision in the Copyright Act." *Octane Fitness*, l34 S.Ct at 1756 n.6 (citation omitted). A district court may "consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance consideration of compensation and deterrence.'" *Id*. (citations omitted). Under § 285 as well, "equitable discretion should be exercised 'in light of [these] considerations.'" *Id*. at 1756 (citations omitted).

Defendants plan to ask the Court to declare the case exceptional and for an award of their attorneys' fees incurred defending against ATEN's unusual and improper litigation approach and its unsupportable substantive positions. ATEN's behavior, as detailed below, has unnecessarily multiplied the proceedings and increased the fees and costs against the Defendants who are their market competitors.

    a.  <u>ATEN Swapped Counsel Four Times, Unnecessarily Increasing the Burden on the Court and the Parties</u>

Plaintiff changed law firms more than four times during the case and changed lead trial counsel more than five times, unnecessarily complicating this case and adding burdens to all parties, including the Court. Between the time this case was transferred from the Eastern District of Texas in June 2015 to this Court's entry of its April 27, 2016 Claim Construction Order, ATEN was represented by Fish & Richardson, Orrick, Holland & Knight, Farney Daniels, and the Devlin Law and OPES firms. [Dkt. 234-1. at ¶ 24.] ATEN has since changed firms *again* and is currently represented by Mei & Mark.

Each change in counsel forced Defendants to spend time and expense retreading many agreements of counsel and issues that had been resolved, often resulting in lost progress on agreements and additional motion practice. Many deadlines, including those related to discovery and expert reports, were repeatedly extended to accommodate changes in counsel. Source code review, which became the focus of many disputes and motion practice, would have been substantially streamlined if ATEN had not changed counsel multiple times.

For example, ATEN's fourth counsel was unaware that it was precluded from amending or supplementing ATEN's infringement contentions based on any previous or newly requested inspection and production of source code pursuant to the November 18, 2014 Discovery Order. Defendants' counsel ultimately was willing to allow as a professional courtesy a limited additional review to assist ATEN's new counsel and newly retained expert (its prior expert passed away) to get up to speed. Eventually, ATEN agreed to pay some of Defendants' costs associated with post-discovery source code review, evidencing the injustice that was and continued to occur. However, ATEN has failed to make any such agreed to payment.

    b.  <u>The Court Struck and ATEN has dropped over 70% of Its Originally Accused Products and Claims Establishing that ATEN's Positions were Exceptional</u>

ATEN's approach of asserting 6 patents and 72 claims against more than 125 accused products has made this case unwieldy from the start. The Court struck portions of ATEN's expert report, eliminating almost 100 accused products from the case. Defendants have also successfully dismissed the '112 patent and the '275 patent. Yet, during all of claim construction and discovery, Defendants have been required to address all asserted claims and undertake infringement/non-infringement and invalidity analyses as to all accused products. ATEN's strategy has dramatically increased litigation costs.

      c.    <u>ATEN's Attempt to Forum Shop in Texas Failed, and the Belkin Claim Construction Was Adopted by the Same Judge in this Case</u>

ATEN purposefully chose the Eastern District of Texas knowing that the Central District of California (the most logical venue) had already considered most of the patents and issued an unfavorable claim construction. *See ATEN Int'l Co. Ltd., et al. v. Emine Tech Co., Ltd, et al.*, CV No. SACV 09-0943 (CDCA). As admitted by ATEN, each of the Defendants resides and/or does business in Taiwan, China, California or Pennsylvania. (*See* Dkt. No. 29, ¶¶ 9-13.) Similarly, ATEN primarily does business in Taiwan, China or California, and has US headquarter offices in California. [Dkt. No. 29, ¶¶ 9-13.] Despite this, ATEN chose to file this lawsuit in the E.D. Texas to avoid the likely scenario that its patent claims would be narrowly construed again.

In its efforts to avoid this Court's prior constructions, ATEN sought to manipulate the venue of this action. Prior to August 6, 2014, ATEN Technology, Inc. was the owner of three (3) of the six (6) patents it originally asserted in this Action: the '275 Patent, the '287 Patent, and '217 Patent. However, on the same day that Plaintiff filed this lawsuit (August 6, 2014), ATEN Technology, Inc. assigned its patent right to Plaintiff and detached itself from the patent rights at issue. (*Id.*)

ATEN's tactic in filing its complaint in Texas, despite the Central District of California having already construed significant claim terms at issue, forced Defendants to comply with an accelerated docket and redo work that had already been performed before the CACD Court in prior cases, required that Defendants unnecessarily consume valuable and limited resources. Notably, once the case was rightfully transferred to the Central District of California, the Court applied its identical claim constructions from *Belkin* to every disputed claim term in this case.

      d.    <u>ATEN Knew that Once this Court Adopted the Claim Construction from *Belkin* the '112 Patent Could not be Asserted, but ATEN Persisted to Run Up Costs Unnecessarily</u>

ATEN knew that this Court had previously construed the "body" term of the '112 patent in *Aten Int'l Co., Ltd., et al. v. Emine Tech Co., Ltd., et al.*, CV No. SACV 09-0943 (CDCA) ("Emine litigation"). However, ATEN tried to assert the same patent under a different claim construction theory in a different district. In the Emine litigation, ATEN fully briefed and presented at oral argument a construction of the term "body," which the Court rejected in favor of its own construction, substantially limiting the applicability of the '112 patent. *See* ATEN's opening and reply claim construction briefs in the Emine litigation (Dkt. 274, 286). Since this Court construed that term in the Emine litigation, nothing occurred that would change the scope or construction of the claims of the '112 patent in the present litigation.

Before the Emine litigation, the International Trade Commission ("ITC") also construed the term "body." In the ITC proceeding, ATEN also had the opportunity to fully brief the construction for the term "body." After a consideration of all the arguments and evidence presented, the ITC in its findings construed "body" in a manner consistent with the subsequent, limiting, CACD construction.

ATEN had two opportunities to fully litigate the claims of the '112 patent. Even so, ATEN tried to re-litigate issues for a third time. ATEN did this without providing compelling reasons as to why the existing constructions should be ignored in favor of its new arguments. ATEN could have stipulated to make the Emine Construction Order final in this litigation and have it reviewed on appeal. Instead, ATEN attempted to re-litigate its patents in Texas to avoid this Court's construction.

What makes this behavior more remarkable is that although this case had been pending for 2 years, and although ATEN had served infringement contentions, and even a preliminary expert analysis, ATEN's prior counsel had not examined the accused Uniclass products to assert a claim that the accused Uniclass products include a "body." The correspondence between counsel of one year ago makes this abundantly clear. *See* attached correspondence attached hereto as *Exhibit A*. This lack of substantive justification for bringing infringement claims is exceptional and warrants an award of attorneys' fees and costs.

   e. <u>ATEN Asserted the '275 Patent Knowing that It Was Asserting a Claim Rejected by the USPTO</u>

ATEN only asserted one claim of the '275 patent: claim 45. However, as alleged in the Defendants' counterclaims and further set out in the Defendants' invalidity contentions, the USPTO inadvertently, and by clerical error, issued the wrong claims in the reexamination of the '275 patent. Claim 45 was one of those wrongly issued claims. ATEN was aware of this fact, and yet continued to wrongfully assert claim 45. Defendants notified ATEN of this error for a third time via e-mail correspondence, adding that:

> Aten's continued assertion of a claim that it did not rightly obtain is clearly for an improper purpose, namely, to harass, cause unnecessary delay, and needlessly increase the cost of litigation in this matter. For example, despite the fact that claim 45 is unenforceable, Aten has forced the Defendants to incur costs and legal fees in preparing counterclaims and invalidity contentions. Moreover, Aten's continued assertion of claim 45 in this matter is forcing Defendants to incur additional costs and legal fees in regard to claim construction, as claim 45 of the '275 patent requires construction of at least eight (8) claim terms.

Email correspondence from Robert Aycock to Whitney Reichel, May 19, 2015, attached hereto as *Exhibit B*.

In *H-W Technology, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014), the Federal Circuit found that an erroneously issued claim that was not correctable by the court was unenforceable because "[t]o hold otherwise would potentially permit patentees to assert claims that they never asked for nor rightly attained. Such a result would be inequitable and undermine the notice function of patents." *Id*. at 1335. Thus, claim 45, an erroneously issued claim that cannot be corrected by the court, was also unenforceable. Nevertheless, ATEN asserted it against Defendants for many months, requiring Defendants to devote precious limited pages in its claim construction briefing at the expense of providing a more complete briefing other patent claim terms. While not expressly acknowledging these unreasonable positions as explained by Defendants, ATEN was forced to file a stipulated dismissal regarding the '275 Patents because of its obvious defects, but not without Defendants spending their limited resources to force the issue.

    f.   <u>ATEN Misrepresented the Dismissal of the '275 Patent to the Taiwanese Court</u>

The '275 patent was dismissed because it was incorrectly issued by the USPTO and the asserted claim 45 was invalid as a matter of law. ATEN was aware of this fundamental defect in the patent, in part because Defendants made these arguments in their counterclaims and invalidity contentions. Eventually, the '275 patent was withdrawn from this case. However, when explaining the circumstances of the '275 patent's dismissal to the Taiwanese Court in the breach of contract litigation, ATEN misrepresented why the '275 patent was dismissed. In that proceeding, ATEN at best misinterpreted and at worst falsely explained Judge Guilford's ruling:

> According to Judge Guilford's decree, there is a limitation to the total number of terms to be explained in the claim construction proceeding, and the number of Appellee's claim terms exceeded the limitation, necessitating both parties to negotiate for a result to comply with Judge Guilford's request; after negotiation between both parties, the Appellee withdrew the '275 patent claims, then made a joint stipulation and drafted the content of decision for the Court to sign **Accordingly, it can be seen that the above-decision was reached only because appellee's proposed claim terms for claim construction exceeded the requirement set by the Court**, who requested both parties to negotiate and withdraw a portion of the claims; after subsequent negotiation, both parties jointly stipulated and submitted to the Court, that the appellee withdrew the '275 patent claim in dispute, and shall not make any more assertion based upon the claims in the '275 patent;

11

ATEN's filing to Taiwan Court, date October 6, 2015 (certified translation) (emphasis added) (internal citations omitted). While Judge Guilford has repeatedly asked ATEN to limit the scope of the litigation, the '275 patent was dismissed because it was invalid and presented no claim for relief for ATEN. ATEN's false representation as to why the '275 patent was dismissed was unethical and prejudiced the Defendants.

    g. <u>ATEN has Knowingly Accused Defendants' Foreign Sales of Products of Patent Infringement, in Direct Contradiction of Patent Law</u>

ATEN knows that it can only sue for infringement products that are sold in the United States. 35 U.S.C. 271(a) (". . .whoever without authority makes, uses, offers to sell, or sells any patented invention, **within the United States** or imports **into the United States** any patented invention during the term of the patent therefor, infringes the patent.") (emphasis added); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) ("It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad.").

Since the commencement of this case, ATEN has had notice that its accusations against the Prima T products are frivolous because the Prima T products are **not** sold in the United States. In correspondence between counsel, Defendant's counsel emphasized that "many of the accused products actually are NEVER sold into any U.S. jurisdictional areas or territories." Email correspondence between Jeff Lee and Whitney Reichel (March 6, 2015).

Despite being presented with uncontroverted evidence that the Prima T products have never been sold within the United States, ATEN will not withdraw its assertions against those products and Defendants have been forced to prepare defenses for these non-infringing products. ATEN also has not presented any evidence that it purchased or can independently support its claims of U.S. sales of the Prima T products. ATEN was put on express notice of this error, and it has completely ignored it.

    h. <u>ATEN Refused to Vacate the Initial Trial Date Despite Reasonable Uncertainty Regarding the Scope of the Trial, Unnecessarily Running Up Costs and Multiplying the Proceedings</u>

Defendants sought to work with ATEN to vacate the trial date when it became clear that trial preparation on the more than 120 accused products would become unnecessary if all, or a part, of the motion to strike ATEN's expert report was granted. ATEN refused. Consequently, Defendants conducted trial preparation on all accused products, incurring significant, unnecessary costs. ATEN lacked diligence in accusing many products that simply could not infringe – even when put on express notice of flaws in ATEN's analysis. Ultimately, the trial

date was moved upon review of Defendants' request, but not before Defendants conducted substantial trial preparation.

      i. <u>ATEN Accuses the Prima T8 and the Prima 8 Under the Same Infringement Theory, Deliberately Overlooking Material Differences Between the Products</u>

The Prima T8 is distinct from the Prima 8 in its circuitry, function, and software. In Exhibits 4-1A and 4-1B of his Report, Dr. Lavian says "Uniclass sometimes refers to Prima T8 as Prima 8, and thus some of the physical [sic] provided below is based on the 'Prima 8." (Ex. A, Lavian Report at Ex. 4-1A at 1.) However, this statement is erroneous as the Prima 8 and Prima T8 are not the same. Dr. Lavian could have learned from a simple side-by-side comparison of the Prima 8 and Prima T8 switches that these two switch models are not the same and cannot even work with each other.

The Prima switch that Dr. Lavian analyzed, and included pictures of, in ATEN's Original Infringement Contentions is a Prima 8 and not the accused Prima T switch. *See* Ex. A, Lavian Report Ex. 4-1A at pages 13, 16, 18, 33, 35, and 46. Dr. Lavian includes the pictures in an attempt to show that the accused Prima T8 includes a number of the claim limitations for the '141 Patent. Again, the pictures Dr. Lavian includes in his infringement analysis are not of the accused Prima T8 but are of the non-accused and very different Prima 8. Specifically, Dr. Lavian says that the picture on page 9 of his Ex. 3-1 shows that "[t]he Accused Instrumentalities [Prima T switches] have a control device (e.g., Atmel ATmega64A microcontroller, highlighted on the board)…." *See* Ex. A, Lavian Report Ex. 3-1 at page 9. Dr. Lavian is wrong. He could have learned of his mistake through a simple physical inspection of an actual Prima T8 circuit board rather than relying solely on his inspection of the non-accused and different Prima 8 switch.

This is not the only instance where Dr. Lavian's failure to inspect an actual accused Prima T8 results in such error. For example, in Dr. Lavian's Ex. 4-1A infringement analysis of the Prima T products, Dr. Lavian opines that the Prima 8 includes emulators in the form of a Cypress CY7C63723C integrated circuit ("IC") and/or two "SL811HS" chips. *See* Ex. A, Lavian Report Ex. 4-1 at pages 14-18. The accused Prima T8 switch does not include these same chips. Instead, the Prima T8 uses a Cypress CY7C63823.

Defendants have provided information to ATEN on multiple occasions dating back to 2015 highlighting the differences between the Prima 8 and the Prima T8 switches. Regardless, ATEN insists on conflating the two products, unwilling to perform the necessary research on the products that it accuses.

j. ATEN's Technical Expert Only Examined Three of the Accused Products Despite Offering an Infringement Opinion on Dozens of Products

Despite asserting over 125 products, ATEN has demonstrated that it has not undertaken a thorough examination of the products that it accuses and has accused. ATEN's technical expert, Dr. Lavian, never claims that he examined more than three of the accused products: "I have personally used the Uniclass Prima T8 8-port device, the Linkskey LKV-248SUSK 4-port device, and the small 2-port USB KVM switches." Dr. Lavian's Expert Report, 12/16/16, ¶ 31. Dr. Lavian's incomplete examination of the accused products undermines his entire infringement analysis and will weaken his credibility at trial.

k. ATEN Only Provided Infringement Charts for a Small Fraction of the Accused Products

On November 24, 2014, ATEN served its Original Infringement Contentions accusing over 120 of Defendants' products. *See* Dkt. 42. However, ATEN only charted five (5) of the over 120 accused products, and claimed that those five were representative of the other products. ATEN never explained how those five products represented the remaining products. ATEN stalled for two years and waited for fact discovery to close before submitting more complete infringement charts. Defendants were forced to go through fact discovery without full notice of ATEN's infringement theories.

l. ATEN Improperly Asserted the '141 Patent Against the LKV-248AUSK and then Withdrew the Assertion when it was Too Late for Defendants to Respond

From November 24, 2014 until December 16, 2016, ATEN contended that the LKV-248AUSK product, produced and sold by Defendant Uniclass, infringed each of the 27 claims of the '141 Patents. Dkt. 266, Statement of Uncontroverted Material Facts and Contentions of Law ("SoF) ¶¶ 2-4. However, the LKV-248AUSK product was sold in the United States in 2005—more than one year before the July 24, 2007 filing date of the '141 Patents, and thus, could not infringe under pre-AIA § 102(b). Moreover, because the LKV-248AUSK anticipated every claim of the '141 Patents, none of the other accused products could have infringed that patents.

During fact discovery, Defendants disclosed and produced all necessary information, documentation, and inspection to ATEN and its counsel regarding the LKV-248AUSK and its noninfringement, particularly that it constituted prior art to the '141 Patents. When ATEN did not withdraw its contentions, Defendants spent considerable effort and time solidifying its invalidity defense based on the accusation of prior art. These efforts came at the expense of developing other defenses. The LKV-248AUSK was one of the only products for which ATEN

had provided infringement charts, and was presumably representative of dozens of other products. After fact discovery had closed, ATEN withdrew their contentions against the LKV-248AUSK. Without an accusation against the LKV-248AUSK, Defendants' complete invalidity argument was no longer feasible. Although Defendants might have been able to make a similar invalidity argument based on ATEN's CS1762 product, fact discovery was closed and Defendants were left unable to pursue alternate defenses. ATEN's use of the accused products under the '141 Patents has and will continue to cause Defendants irreversible prejudice.

<u>ATEN's Final Infringement Contentions violated the Standing Patent Rules of the Eastern District of Texas</u>

First, ATEN disregarded the deadlines set forth in the Standing Patents Rules in E.D. Texas regarding its Final Infringement Contentions. S.P.R. 4.1 required that ATEN disclose its Final Infringement Contentions within 28 days of the Court's April 27, 2016 claim construction order. Instead, ATEN served its Final Infringement Contentions through its expert report on December 16, 2016, more than eight months after claim construction, well after the July 27, 2016 close of fact discovery, after expert reports had been exchanged, and two years after the Original Contentions were submitted.

Second, ATEN amended its Original Contentions without the Court's approval. Pursuant to S.P.R. 4.1.2, ATEN needed the Court's approval to amend its Original Contentions because its amendments were (1) not a direct result of the April 27, 2016 claim construction order; and (2) not a discovery of nonpublic information that was only recently discovered despite ATEN's diligence. The amendments to the infringement contentions came almost eight months after the Court's claim construction order, and nothing in ATEN's amendments related to the Court's claim constructions. Moreover, all information that ATEN might have needed to amend its Original Contentions had been accessible to ATEN, or in its possession, since March 2015, well before the close of fact discovery and more than a year before the Court's claim construction.

Third, ATEN's Final Infringement Contentions failed to comply with the other formalities laid out in the Standing Patents Rules. ATEN did not provide a redline against its prior contentions, nor did it submit a statement of reasons for each amendment identifying or explaining any "good cause" for its amendments as required by S.P.R. 4.1.2.

Fourth, the Final Infringement Contentions contained material changes from the Original Contentions. For instance, claim 2 of the '217 Patents was asserted for the first time in the Final Infringement Contentions. Unsurprisingly, the Court struck these changes. [Dkt. 345 at 6.]

Fifth, the sheer size of the Final Infringement Contentions indicates a bad faith attempt to bog down litigation and prejudice Defendants. The Final Infringement Contentions were over

1,700 pages long (without any sort of redline or comparison to Original Contentions) and they were submitted just 3 months before the then-existing trial date.

    m. <u>ATEN's Technical Experts Changed Positions Regarding the Fundamental Capabilities of the '287 Patent</u>

During claim construction, ATEN took the position that the accused products are incapable of synchronous switching where "the data stream passing between the first computer system and the peripheral device is left uninterrupted at the time of switching." ATEN's expert, Charles Narad, claimed that synchronous switching was "not implementable." [Dkt. 93-1 ¶ 81.] Mr. Narad confirmed in his opinion that uninterrupted switching was impossible under the patents:

> Q. But necessarily when there is synchronously -- excuse me. But necessarily under the patent when there's synchronous switching, there must be interruption of the data flow, according to your understanding; correct?
> A. Did you say "synchronous"?
> Q. "Synchronous."
> A. Yes, that's my understanding.

May 27, 2015 Deposition of Charles Narad, 23:19-24 – 24:1-6. Defendants based their noninfringement and invalidity arguments considering the representations made by ATEN's technical experts. After Mr. Narad's passing, ATEN employed Dr. Lavian as its technical expert. While Mr. Narad asserted that "[w]hen synchronous switching occurs, any connection between a switched peripheral device and a host computer is **necessarily changed or interrupted**" (Dkt. 93-1 at 5), Dr. Lavian claims "[t]he accused instrumentalities have console devices that can be switched **either synchronously** or asynchronously with one peripheral device to the same computer system or to different computer systems, **without interruption of the signal to the peripheral device**. Dr. Lavian's 12/16/16 Expert report, Exhibit 1-2 at 4. Dr. Lavin clarifies that "console devices can be switched **synchronously** with one peripheral device to the same computer system or to different computer systems, **without interruption** of the signal to one peripheral device." *Id*. at 5.

ATEN's reversal of expert opinion has denied Defendants a fair opportunity to defend themselves. ATEN's decision to change its infringement theories in the shadow of Mr. Narad's passing is exceptional. The costs incurred by Defendants responding to such behavior will support the granting of their fees.

  Again, we hope that you and your client in good faith consider this offer and work to settle this dispute without a costly trial.

         Sincerely,

         PIA ANDERSON MOSS HOYT

         */s/* Joseph G. Pia
         */s/* Robert E. Aycock
         *Attorneys for Defendant*