Jen-Feng Lee, SBN 204328 (jflee@ltpacificlaw.com)
Kenneth K. Tanji, Jr., SBN 162273 (ktanji@ltpacificlaw.com)
LT PACIFIC LAW GROUP, LLP
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Robert Aycock (Admitted *Pro Hac Vice*) (raycock@pa-law.com)
Joseph G. Pia (Admitted *Pro Hac Vice*) (joe.pia@pa-law.com)
PIA ANDERSON MOSS HOYT
136 East South Temple, 19th Floor
Salt Lake City, UT 84111
Telephone: (801) 350-9000
Facsimile: (801) 350-9010

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| ATEN INTERNATIONAL, CO. LTD. | No. 2:15-cv-04424-AJG-AJW |
|---|---|
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR EXCEPTIONAL CASE DETERMINATION UNDER 35 U.S.C. § 285** |
| vs. | |
| UNICLASS TECHNOLOGY CO., LTD., et al. | |
| Defendants. | Judge: Hon. Andrew J. Guilford |
| | Courtroom: 10D |

1

## TABLE OF CONTENTS

*I.*    **INTRODUCTION**.................................................................*1*

*II.*   *LEGAL STANDARD*.........................................................*2*

*III.* *ARGUMENT*.....................................................................*3*

    **A.**   **Defendants are the Prevailing Party**...........................*3*

    **B.**   **This is an Exceptional Case** ......................................*3*

       a.   ATEN Did Not Conduct an Adequate Pre-filing Investigation ............*3*

          1.   Over 70% of the Originally Accused Products and Claims were Dropped or Dismissed ...............................................*5*

          2.   ATEN Asserted the '275 Patent Knowing that Claim 45 was not an Enforceable Claim ...........................................*5*

          3.   ATEN's '141 Patent was Invalidated by its Own Product, the CS1762....................................................*7*

          4.   ATEN Based its Accusation of the Prima T8 on its Analysis of the Different Prima 8, Deliberately Overlooking the Material Differences Between the Products ...............................*7*

          5.   ATEN Knowingly Accused Defendants' Foreign Sales of Products of Patent Infringement Directly Contradicting U.S. Patent Law ..............*8*

       b.   ATEN Unnecessarily Increased the Costs of Claim Construction.........*9*

          1.   ATEN Attempted to Forum Shop and Reconstrue Settled Terms .....*9*

          2.   ATEN Forced Wasteful Claim Construction in Texas after the Case had been Transferred to California ...........................*10*

          3.   ATEN Attempted to Relitigate Settled Claim Terms......................*11*

       c.   ATEN's Exceptional Changes in Counsel and Infringement Positions Drastically Increased the Costs of Discovery.................................*12*

          1.   ATEN Changed Counsel Multiple Times at Critical Junctures in the Litigation...............................................*12*

i

2.     ATEN's Multiple Belated Rounds of Source Code Review Delayed the Case and was Admittedly Unnecessary ............................... 14

3.     ATEN Refused to Limit the Scope of the Case ............................... 15

4.     ATEN's Final Infringement Contentions Violated this Court's Standing Patent Rules ........................................................................ 16

5.     ATEN Maintained Unsubstantiated Assertions Against the LKV-248 17

6.     ATEN's Refusal to Vacate the Trial Date Despite Uncertainty of the Scope of the Trial Increased Litigation ...................................... 18

7.     ATEN's Technical Experts Took Contrary and Unreasonable Positions Regarding the '287 Patent ........................................ 18

d.     ATEN's Unreasonable Litigation Behavior Required Additional Motion Practice in the Lead-Up to Trial ...................................... 19

1.     ATEN Tried to Expand Product Groupings Days Before Trial ....... 19

2.     ATEN Asserted an Abnormally Weak Lost Profits Opinion ........... 20

e.     ATEN's Exceptional Litigation Behavior Led to an Expensive and Disproportionate Trial ........................................................ 20

1.     ATEN Trial Costs were Disproportionate to the Damages Requested at Trial ........................................................................ 21

2.     ATEN's Abnormally Meritless Damages Position at Trial ............. 23

3.     ATEN's Inconsistent Infringement Theories in Trial Resulted in Nonsensical Damages Request at Trial ...................................... 24

C.     **Defendants should be Awarded their Attorney Fees and Expenses, with the Specific Amounts to be Determined at a Later Date** ................. 25

IV.    *CONCLUSION* .......................................................................... 25

ii

# TABLE OF AUTHORITIES

**Cases**

*Central Soya Co., Inc. v. Geo. A. Hormel & Co.*,
  723 F.2d 1573 (Fed. Cir. 1983) ........................................................................2

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011) ........................................................................2

*Fogerty v. Fantasy, Inc.*,
  510 U.S. 517 (1994)........................................................................................2, 3

*H-W Technology, L.C. v. Overstock.com, Inc.*,
  758 F.3d 1329 (Fed. Cir. 2014) ........................................................................5

*Large Audience Display Sys., LLC v. Tennman Productions, LLC*,
  No. 11-cv-03398-R, 2017 WL 1528774, (C.D. Cal. April 10, 2017) .............10

*Linex Techs., Inc. v. Hewlett-Packard Co.*,
  No. 13-cv-159-CW, 2014 WL 4616847 (N.D. Cal. Sept. 15, 2014) ................3

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S.Ct. 1749 (U.S. 2014) ...........................................................................1, 2

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013) ........................................................................8

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
  360 F.3d 1295 (Fed. Cir. 2004) ........................................................................3

*TechRadium, Inc., v. FirstCall Network, Inc.*,
  2015 WL 862326 (S.D. Tex. 2015)...............................................................12, 13

*Universal Elec. Inc. v. Universal Remote Control Inc.*,
  No. 12-cv-00329-AG, 2015 WL 12733442 (C.D. Cal. March 10, 2015)...3, 21, 25

**Statutes**

35 U.S.C. 271(a) ...............................................................................................8

35 U.S.C. § 285..........................................................................................1, 2, 25

iii

1

**Rules**

2

Fed. R. Civ. P. 54(d)(2)(C) ................................................................................3, 25

3

Fed. R. Civ. P. 26 ........................................................................................................4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

As the prevailing parties in this action, Defendants Uniclass Technology Co., Ltd. ("Uniclass"); Electronic Technology Co., Ltd of Dongguan Uniclass, Airlink 101, Phoebe Micro Inc., Broadtech International Co., Ltd. D/B/A Linkskey, Black Box Corporation, and Black Box Corporation of Pennsylvania (the "Other Defendants") (collectively, "Defendants") hereby move this Court to determine that this case is exceptional and award attorney fees and expenses to Defendants under 35 U.S.C. § 285.

## I.   <u>INTRODUCTION</u>

This lawsuit has drained Defendants' resources for three years as they have responded to ATEN's continuously changing infringement theories and legal counsel. ATEN accused 127 products without conducting an adequate pre-filing investigation and spent the rest of the case trying to justify its initial accusations in the face of an adverse claim construction order and contrary evidence. ATEN's strategy drove litigation and trial costs to levels disproportionate to the remedy sought. While Defendants ultimately prevailed on every issue, it required millions of dollars of unnecessary fees and costs to do so.

The Supreme Court in *Octane Fitness* provided district courts more discretion to combat abuses in patent litigation by awarding attorney fees and expenses to the prevailing party in cases that are exceptional "with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1756 (U.S. 2014). This case is exceptional in both respects. At the expense of the Court, the public, and the Defendants, ATEN asserted claims that provided no real chance at recovery and litigated in an exceptional manner.

Defendants respectfully request that the Court awards Defendants their attorney fees. Such an award will serve the interests of justice by compensating Defendants for the expenses they were unreasonably forced to incur and by

deterring ATEN from undertaking other litigation that was at least motivated in part by ATEN's desire for "payback" for successful competition in the marketplace.

## II.   <u>LEGAL STANDARD</u>

The Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. In this context, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). A party need only prove its entitlement to attorney fees by a preponderance of the evidence. *Id.* at 1758. Generally, expenses may also be awarded under Section 285. *See Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983).

In light of *Octane Fitness*, district courts determine whether a case is "exceptional" on a case-by-case basis, "considering the totality of circumstances." *Id.; see also Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011) ("[W]e are mindful that the district court has lived with the case and the lawyers for an extended period.") In *Octane Fitness*, the Supreme Court referred to a nonexclusive list of factors that could aid courts in this determination, "including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 1756 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

District courts have discretion to award fees where "a party's unreasonable conduct – while not necessarily independently sanctionable – is nonetheless" exceptional. *Id.* at 1757. "A case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases

to warrant a fee award." *Id.* Likewise, courts may grant attorney fees where "evidence at trial showed that th[e] litigation was at least in part motivated by Plaintiff's desire for 'payback' for Defendant's successful competition in the marketplace. . ." *Universal Elec. Inc. v. Universal Remote Control Inc.* No. 12-cv-00329-AG, 2015 WL 12733442 at *2 (C.D. Cal. March 10, 2015).

Fed. R. Civ. P. 54(d)(2)(C) provides that "the court may decide issues of liability for fees before receiving submissions on the value of services."

## III.   ARGUMENT

### A. Defendants are the Prevailing Party

Defendants are the "prevailing party" on every issue presented by ATEN. (Dkt. 469, 164, 422.) Defendants also prevailed on their claims against ATEN regarding the invalidity of the '217 Patent and the '141 Patent. (Dkt. 469 at 3.)

### B. This is an Exceptional Case

#### *a.  ATEN Did Not Conduct an Adequate Pre-filing Investigation*

The adequacy of Plaintiff's pre-filing investigation is an important factor in whether granting attorney fees and expenses is appropriate. *See Aleksander L. Yufa v. TSI Inc.* No. 12-cv-1614-FMO, Dkt. 135 at 3 (C.D. Cal. August 12, 2015). "Patent litigation is a burdensome venture for all parties involved. Thus, plaintiffs must conduct careful investigation before bringing suit." *Linex Techs., Inc. v. Hewlett-Packard Co.*, No. 13-cv-159-CW, 2014 WL 4616847 at *3 (N.D. Cal. Sept. 15, 2014). "[T]he key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302 (Fed. Cir. 2004).

From the start, ATEN has demonstrated that it did not complete a thorough analysis of the products that it accused. On November 24, 2014, ATEN served its Original Infringement Contentions accusing over 125 of Defendants' products of infringing over 60 patent claims from five patents. (*See* Dkt. 42.) Eventually, ATEN asserted an additional patent, bringing the total accusations to 72 claims

3

from six patents. However, ATEN only charted five of the accused products, claiming that those five were representative of the other products. ATEN never explained how those five products represented the remaining products, merely listing them with the so-called "representative products." (*See* Declaration of Robert E. Aycock in Support of the Defendants' Motion to Declare this Case Exceptional ("Decl.") at ¶ 11, filed concurrently herewith.) Instead, ATEN stalled for two years, waiting until after claim construction and the close of fact discovery before disclosing all of its infringement theories. At each juncture when Defendants requested updated or complete infringement theories, ATEN either (1) delayed, never providing updated information, or (2) changed counsel, losing the institutional knowledge of prior counsel agreements and promises to provide additional analysis. (Decl. ¶¶ 54-63.)

At trial ATEN's technical expert, Dr. Lavian, made admissions that highlight an abnormal lack of pre-filing investigation and diligence during discovery. Although ATEN accused over 125 products, Dr. Lavian never claimed that he examined more than three of them: "I have personally used the Uniclass Prima T8 8-port device, the Linkskey LKV-248SUSK 4-port device, and the small 2-port USB KVM switches." (Dkt. 336 at 9, ¶ 31.) At trial, Dr. Lavian confessed that he had not even *used* all three of the products listed in his report, explaining, "it's a long list of products, very long list. I don't have, in my home, room for all of them."[1] (Tr. 9/22 Vol.1 at 51:3-55:1.) Yet, Defendants were forced to analyze all of ATEN's asserted claims and the accused products in showing the absence of infringement. This failure to purchase and test the many products accused of

---

[1] Dr. Lavian attempted to reconcile his failure to use all the asserted products by claiming that he tested products, but only after close of expert discovery, after his deposition, and immediately before trial, effectively removing Defendants' right to pretrial disclosure. This violated the Court's Scheduling order and Federal Rule of Civil Procedure 26. (Decl. ¶ 13.)

4

1   infringement weighs in favor of a finding that the case is exceptional. *Yufa,* No.
2   12-cv-1614-FMO, Dkt. 135 at 3.

3              1. *Over 70% of the Originally Accused Products and Claims*
              *were Dropped or Dismissed*
4
5       ATEN's approach of asserting 6 patents and 72 claims against 127 accused
6   products made this case unwieldy from the start, and Defendants spent
7   considerable time and resources dismissing ATEN's unfounded allegations. The
8   Court struck portions of ATEN's expert report, eliminating the majority of the
9   accused products from the case. (Dkt. 345.) Defendants also successfully
10  dismissed the '112 Patent and the '275 Patent. (Dkt. 157, 422.) By trial, only three
11  of the 46 products ATEN originally accused of infringing the '289 Patent and one
12  of the 62 products accused of infringing the '217 Patent remained. This extreme
13  winnowing of claims exposes the weakness of ATEN's pre-filing investigation.
14  Although Defendants were able to eventually dismiss many of ATEN's claims
15  before trial through extensive motion practice, Defendants were required to
16  address **all** asserted claims and undertake noninfringement and invalidity analyses
17  as to **all** accused products during claim construction and discovery because ATEN
    refused to proportionately limit the scope of the case.

18             2. *ATEN Asserted the '275 Patent Knowing that Claim 45 was*
19                *not an Enforceable Claim*

20      ATEN's assertion of claim 45 of the '275 Patent typifies its inadequate pre-
21  filing investigation. As alleged in Defendants' counterclaims and further set out in
22  the Defendants' invalidity contentions and claim construction briefing, ATEN
23  knew that the USPTO inadvertently issued claim 45 in the reexamination of the
24  '275 Patent. A simple examination of the prosecution history reveals this, and
25  Defendants notified ATEN of the USPTO's error early in this case. (Decl. ¶ 16.)
26  ATEN knew, or should have known, that its assertion of the '275 Patent was
27  meritless, supporting a finding of exceptionality. *See H-W Technology, L.C. v.*
28  *Overstock.com, Inc.* 758 F.3d 1329, 1335 (Fed. Cir. 2014) (asserting an

5

erroneously issued claim "would be inequitable and undermine the notice function of patents.") Nevertheless, ATEN asserted a facially invalid claim against Defendants for months, requiring Defendants to devote precious pages in its claim construction briefing to the '275 Patent at the expense of providing more complete briefing for other claim terms.

Defendants notified ATEN of its error multiple times, including via e-mail correspondence, warning of the costs incurred by briefing claim construction on the '275 Patent. (Decl. ¶¶ 16-17.) ATEN's counsel responded, "[w]e are investigating the assertions in your letter and will respond in due course (**though we do not anticipate we will be able to complete this investigation before your claim construction brief is due next week**)." (Decl. ¶ 46.) ATEN did not stipulate to dismissing the '275 Patent until four months later, even though nothing regarding the '275 Patent's illegitimacy had changed. (Dkt. 157)

While not expressly acknowledging these unreasonable positions as explained by Defendants, ATEN was forced to file a stipulated dismissal regarding the '275 Patent because of its obvious defects. However, when explaining the circumstances of the '275 Patent's dismissal to the Taiwanese Court in parties' co-pending breach of contract litigation, ATEN misinterpreted this Court's ruling:

> [A]fter negotiation between both parties, the Appellee withdrew the '275 patent claims, then made a joint stipulation and drafted the content of decision for the Court to sign. Accordingly, it can be seen that <u>the above-decision was reached only because appellee's proposed claim terms for claim construction exceeded the requirement set by the Court</u> . . .

(Decl. ¶ 20, certified translation, emphasis added, internal citations omitted). The '275 Patent was dismissed because it was invalid and presented no possibility of relief for ATEN. ATEN's false representation to the Taiwanese Court as to why the '275 Patent was dismissed added to the prejudice caused by ATEN's improper assertion of an incorrectly issued claim.

### 3. ATEN's '141 Patent was Invalidated by its Own Product, the CS1762

ATEN's exceptional behavior includes propounding a series of objectively unreasonable infringement positions, including asserting a patent that its own product invalidated. The jury found the '141 Patent invalid based on anticipation. (Dkt. 448 at 4.) ATEN's own product, the CS1762, was known and used by ATEN as early as June 4, 2004, well before the July 24, 2006 critical date of the '141 Patent. (Tr. 9/20 Vol.2 at 3:4-9; Tr. 9/27 at 176:22-177:22.) As shown at trial, the CS1762 practices all of the limitations identified within the '141 Patent, including hot key switching, USB input devices, and emulation. (Tr. 9/27 at 177:23-179:11; 181:10-185:7; Trial Ex. 1585.) ATEN did not disclose the CS1762 as a cited reference during the prosecution of the '141 Patent. (Trial Ex. 2.) ATEN's assertion of a patent invalidated by its own, undisclosed product underscores ATEN's insufficient pre-filing investigation and exceptionality.

### 4. ATEN Based its Accusation of the Prima T8 on its Analysis of the Different Prima 8, Deliberately Overlooking the Material Differences Between the Products

ATEN's accusation of the Prima T4, Prima T8, and Prima T16 while analyzing the distinct Prima 8 demonstrates its inadequate pre-filing investigation. The Prima T8 is distinct from the Prima 8 in its circuitry, function, and software. (Tr. 9/26 at 146:9-148:6; Decl. ¶ 35.) Dr. Lavian could have learned from a simple side-by-side comparison of the Prima 8 and Prima T8 switches that these two switch models are not the same and are not compatible with each other. (Decl. ¶ 35.) However, at trial, Dr. Lavian testified that he had never used a Prima T8 or a Prima T4 product. (Tr. 9/22 Vol.1 at 51:3-55:1.) Instead, the switch that Dr. Lavian analyzed in ATEN's Original Infringement Contentions was a Prima 8, a device that ATEN did not accuse of infringement. (Decl. ¶ 34.) ATEN's failure to inspect the correct products and its decision to base its infringement position throughout the entire litigation and trial on an analysis of a completely different product is

7

exceptional. *See Kinglite Holdings Inc. v. Micro-Star International Co. Ltd.*, No.
14-cv-03009-JVS, Dkt. 235 at 10-11 (C.D. Cal. June 23, 2016) (finding
exceptionality where plaintiff's expert witnesses did not inspect the accused
products and where plaintiff could have easily confirmed accused elements before
filing suit.)

Defendants informed ATEN on multiple occasions dating back to 2015 of
the differences between the Prima * and the Prima T* switches. Regardless, ATEN
insisted on conflating the two products, unwilling to perform the necessary
research on the products that it accused. A week before trial, ATEN, realizing its
fundamental misunderstanding, attempted to accuse the Linskey equivalents of
the Prima switches (the switches that Dr. Lavian had actually analyzed) **for the
first time** in its Proposed Jury Instructions. (Dkt. 414 at 5-6 ¶ 46.) ATEN's last-
minute attempt to fix its pre-filing deficiency failed and the court granted
Defendants' Motion *in limine to* Exclude ATEN from Expanding its Previously
Identified Representative and Linked Product Groupings. (Tr. 9/20 Vol.1 at 13:7-
8.) ATEN's refusal or inability to correctly identify and analyze the products that
it accused separates this litigation from run-of-the-mill cases.

> 5.  *ATEN Knowingly Accused Defendants' Foreign Sales of
> Products of Patent Infringement Directly Contradicting
> U.S. Patent Law*

ATEN knows that it can only sue on products that are sold in the United
States. 35 U.S.C. 271(a); *Power Integrations, Inc. v. Fairchild Semiconductor
Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013). Since the commencement of this
case, ATEN has had notice that its accusations against the Prima T* products were
baseless because the Prima T* products were **not** sold in the United States. In
correspondence between counsel, Defendant's counsel emphasized that "many of
the accused products actually are NEVER sold into any U.S. jurisdictional areas
or territories." (Decl. ¶ 36.) Despite being presented with this evidence, ATEN did
not withdraw its assertions against the Prima T products, and Defendants were

forced to prepare defenses for these noninfringing products. ATEN never presented any evidence that it purchased or could independently support its claims of U.S. sales of the Prima T products, and the jury found that the Prima T* products did not infringe. ATEN was put on express notice of its deficiency in its pre-filing investigation regarding the Prima T* products and it refused to concede the point or at least take additional discovery, unreasonably increasing the cost and complexity of the litigation.

### b. ATEN Unnecessarily Increased the Costs of Claim Construction

#### 1. ATEN Attempted to Forum Shop and Reconstrue Settled Terms

Adding to the expense and inconvenience required to defend against the overbroad and under-researched claims, ATEN purposefully filed this lawsuit in the Eastern District of Texas ("EDTX") knowing that the Central District of California ("CDCA") the most logical venue had already considered most of the patents and issued a claim construction unfavorable to ATEN. *See ATEN Int'l Co. Ltd., et al. v. Emine Tech Co., Ltd, et al.*, No. 09-cv-0943-AG (C.D. Cal. 2009.) ("Emine litigation").[2]

Prior to August 6, 2014, ATEN Technology, Inc. (located in Orange County, California) was the owner of three of the six patents originally asserted in this Action: the '275 Patent, the '287 Patent, and '217 Patent.  (Decl. ¶ 7.) However, on the same day that Plaintiff filed this lawsuit (August 6, 2014), ATEN Technology, Inc. assigned its patent rights to Plaintiff ATEN International, Inc. to try to support jurisdiction in the EDTX. (Decl. ¶¶ 6-9.) Courts in the CDCA have awarded attorney fees against plaintiffs who have used this same maneuver,

---

[2] ATEN filed the Emine litigation in the Eastern District of Texas despite no documents or witnesses being located closer to Texas than California and even though "ATEN ha[d] not identified a single particularized local interest in the Eastern District of Texas." (Emine litigation, Dkt. 115 at 14-20.)

because "[t]his type of litigation gamesmanship stands out from the ordinary case and necessitated significant work by Defendants' in response." *Large Audience Display Sys., LLC v. Tennman Productions, LLC*, No. 11-cv-03398-R, 2017 WL 1528774 at *1, (C.D. Cal. April 10, 2017) (awarding attorney fees when the patent owner resided in the CDCA and transferred the patent to the plaintiff shortly before the lawsuit to keep the case in the EDTX despite never conducting business in Texas.).

In granting Defendants' Motion to Transfer Venue, the EDTX Court ruled, "the Central District of California is a clearly more convenient forum for the resolution of this action." (Dkt. 94 at 3.) Additionally, the CDCA was familiar with the technology and had already construed significant claim terms at issue. *See* Emine Litigation, Dkt. 307. Despite this, or likely because of this, ATEN filed its complaint in Texas forcing Defendants, at great cost, to comply with an accelerated docket and redo claim construction arguments, including claim construction expert reports and depositions, that had already been performed in the CDCA. Notably, once the case was rightfully transferred, this Court adopted *identical* claim constructions from the Emine litigation to every disputed claim term in this case. (*See* Dkt. 226 at 10, Order Regarding Claim Construction) ("[T]he Court's previous order still casts a long shadow over this case . . . . There doesn't appear to be any good reason for the Court's earlier analysis to apply differently now. . . . [N]othing has occurred that would change the scope or construction of the claims.")

### 2. *ATEN Forced Wasteful Claim Construction in Texas after the Case had been Transferred to California*

ATEN filed its Opening Claim Construction Brief in the EDTX on May 15, 2015. (Dkt. 93.) On the same day, the EDTX Court ordered the case to be transferred. (Dkt. 94.) When it became clear that the EDTX would not hear argument or rule on the claim construction, Defendants' counsel asked ATEN to withdraw its Opening Claim Construction Brief without prejudice to prevent

10

Defendants from having to respond to the brief in a jurisdiction that would not hear the matter and under rules that would make much of the briefing unnecessary once the case was transferred. (Decl. ¶ 42.) ATEN refused to withdraw its brief, and Defendants accordingly were required to prepare their claim construction brief for 26 terms permitted in Texas, although the case had been transferred and California only permits construction on 10 terms. (Dkt. 106.)

Once the case was transferred, this Court, pursuant to S.P.R. 3.1, predictably elected to only construe 10 terms. (Dkt. 226 at 7-8.) The excess briefing conducted in Eastern District of Texas when the case had already been ordered to a venue with proportional claim constructive briefing rules was expensive, wasteful, and avoidable. Moreover, Defendants' unnecessary briefing of 26 claims in the EDTX prejudiced Defendants by leaving them with shallower briefing for the 10 claims construed by this Court. (*See* Dkt. 226. at 9, "The Court notes that the parties' failure to narrow the disputed issues likely hurt their ability to thoroughly brief the terms now before the Court.")

### 3. <u>*ATEN Attempted to Relitigate Settled Claim Terms*</u>

ATEN knew that this Court had previously construed the "body" term of the '112 Patent in the Emine litigation but tried to assert the same patent against Defendants under a different claim construction theory without investigating the underlying products. In the Emine litigation, ATEN fully briefed and presented at oral argument a construction of the term "body." The Court rejected ATEN's proposal in favor of its own construction, substantially limiting the applicability of the '112 Patent. (*See* Emine Litigation, Dkt. 274, 286.) After this Court construed the claims in the Emine litigation, "nothing [] occurred that would change the scope or construction of the claims[]" of the '112 Patent in the present litigation. (Order Regarding Claim Construction, Dkt. 226 at 10.)

11

Before the Emine litigation, the International Trade Commission ("ITC") also construed the term "body." (Dkt. 194-3.) In the ITC proceeding, ATEN also had the opportunity to fully brief the construction of the terms. After a consideration of all the arguments and evidence presented, the ITC construed "body" in a manner consistent with the limiting, CACD construction. (*Id.* at 22.)

ATEN had two opportunities to fully litigate the claims of the '112 Patent. Even so, ATEN "spent[t] significant ink attempting to relitigate the construction of 'body'" for a third time. (Order Regarding Claim Construction, Dkt. 226 at 10.) ATEN did this without providing compelling reasons as to why the existing constructions should be ignored in favor of its new arguments. Such behavior supports a finding of exceptionality. *See TechRadium, Inc., v. FirstCall Network, Inc.,* 2015 WL 862326, at *7 (S.D. Tex. 2015) ("[The] arguments for a different construction [of already construed claims] in the present cases were wholly unsubstantial and without merit. This factor strongly supports finding these consolidated cases exceptional. It was merely a vehicle to relitigate prior, clearly rejected, positions.")

### c. ATEN's Exceptional Changes in Counsel and Infringement Positions Drastically Increased the Costs of Discovery

#### 1. ATEN Changed Counsel Multiple Times at Critical Junctures in the Litigation

ATEN's failure to reasonably limit this case was compounded by its habit of replacing its counsel at critical stages in the litigation. This resulted in a lack of institutional memory of interim agreements and history of the case. Moreover, with new representation, ATEN often reinvented its infringement positions and representative product groupings. ATEN appointed over eight law firms and changed lead trial counsel more than five times, often at critical junctures, needlessly complicating this case and adding burdens to Defendants and the Court.

From the filing of the case through claim construction briefing, ATEN was represented by Fish & Richardson. (Decl. ¶ 56; Dkts. 10, 11, 12.) With its first

counsel ATEN conducted significant discovery on multiple continents, including
fact witness depositions in Taiwan and initial source code review, at great expense
to Defendants. (Decl. ¶ 56.) Shortly after, this case was transferred and ATEN
replaced its counsel with Orrick, and then Holland & Knight, and then Farney
Daniels. (Decl. ¶ 57.) In July 2016, ATEN's technical expert, Charles Narad,
passed away. (Decl. ¶ 120.) ATEN's loss of its technical expert and initial law firm
erased two tiers of institutional knowledge and reversed progress in the talks to
dismiss the '275 Patent. ATEN's rapid changes in counsel required additional
expenditure by Defendants to help ATEN's counsel get up to speed on all issues
including status of fact and expert discovery and source code review. (Decl. ¶ 58-
63.)

Space only permits a few examples. Just before the claim construction
hearing, ATEN appointed new counsel, Devlin Law Firm. Defendants' counsel
had to re-educate ATEN's newest counsel on prior claim construction agreements
including the presentation of evidence – the lack of congruity resulted in both
parties preparing extensive (150-200 slide) presentations at the claim construction
hearing. (Decl. ¶ 59.) Another example is that in May 2016, ATEN's counsel
notified Defendants that they would not assert claim 1 of the '287 Patent. (Decl. ¶
60.) However, that agreement was discarded and ATEN re-asserted claim 1 of the
'287 Patent at trial (*Id.*) ATEN's law firm changes caused the parties to repeatedly
extend deadlines, including those related to discovery and expert reports, to
accommodate changes in counsel. Source code review, which became the focus of
months of disputes and prolonged motion practice, would have been substantially
streamlined if ATEN had not changed counsel multiple times. (*See* Decl. ¶¶ 64-
116.)

ATEN changed counsel yet again right before trial and hired its current law
firm, Mei and Mark. (Decl. ¶ 54.) Once again, agreements with ATEN's prior
counsel were lost in the shuffle, and Defendants were forced to file motions and

13

prepare for hearings to resolve disputes, such as product groupings, that had already been solved. (Dkt. 420; Decl. ¶¶ 142-43.) ATEN's turnstile approach to representation frustrated attempts to narrow the scope of litigation and resulted in a cumbersome trial and prejudice to Defendants.

### 2. *ATEN's Multiple Belated Rounds of Source Code Review Delayed the Case and was Admittedly Unnecessary*

Source code review became an expensive sticking point as ATEN's multiple new counsels evaluated ATEN's infringement contentions and requested their own review to make sense of ATEN's accusations. ATEN's early counsel stressed, "the parties cannot fully evaluate the material disputes over claim scope, or even which claims and terms are at issue, until ATEN has had an opportunity to review Uniclass's source code and make any necessary updated to its infringement contentions." (Decl. ¶ 69.) Early in the case, Defendants' counsel made all source code for every accused product available for inspection. (Decl. ¶ 70.) ATEN only requested two days to conduct its inspection, and the inspection was performed on March 23-24, 2015. (Decl. ¶¶ 70-71.) On March 26, 2015, Defendants provided ATEN with print outs of particular source code that ATEN had specifically requested. (Decl. ¶ 72.)

Almost a year and a half after the initial inspection and after the close of fact discovery, ATEN's counsel sent an email to Defendants' counsel on August 3, 2016 indicating that it believed that it had "received . . . only portions of the software code for three products . . . ." (Decl. ¶ 93.) Defendants' counsel informed ATEN's counsel that the reason only "portions of the software code for three products" had been produced was because that is exactly what ATEN's former counsel had requested. (Decl. ¶ 94.) Still, Defendants agreed in good faith to allow a limited inspection to assist ATEN's new technical expert. (Decl. ¶ 95.) Discussions over this limited inspection stalled as ATEN requested an unlimited inspection over 15 days (after fact discovery had closed and after they had already conducted an inspection) at a time that would not work for Defendants'

14

counsel. (Decl. ¶ 98.) This demand for additional source code required ATEN to request that deadlines for expert reports be extended. (Decl. ¶ 113.) Finally, ATEN's counsel conducted another inspection of Defendants' source code on October 24-25, 2016. (Decl. ¶ 111.) ATEN's counsel agreed to pay the costs incurred by Defendants for the last review, demonstrating the inequity of the demand. (Decl. ¶ 110.)

After Defendants repeatedly allowed additional requests for source code review, even after the close of fact discovery, and agreed to extend deadlines to accommodate ATEN's many changes in counsel, Dr. Lavian revealed at trial, "I don't need to look at source code **at all** to make my opinion." (Tr. 9/20 Vol.2 at 71:23-24, emphasis added.) This shocking revelation shows ATEN unnecessarily caused extensive work, negotiating, payment to experts, travel and arrangements, and the superfluous review of highly confidential material by a direct competitor.

### 3. *ATEN Refused to Limit the Scope of the Case*

ATEN filed its Original Infringement Contentions on November 14, 2014. (Decl. ¶ 10.) The Court issued its Order regarding claim construction on April 27, 2016, adopting the same claim constructions that resulted in a walk-away settlement in the Emine litigation with no monetary payment by the Emine defendants. (*See* Dkt. 226; Tr. 9/20 Vol.2 at 9:14-11:14; Decl. ¶ 50.) However, in this case, ATEN did nothing to limit the scope of litigation after receiving identical, limiting constructions from the same Court and while accusing similar products.

ATEN had ample opportunity to amend its Original Infringement Contentions to dismiss products or claims as it learned new information in discovery. EDTX P.R. 3.1(g) required ATEN to identify within 30 days of inspecting source code how the source code of each accused product allegedly satisfies the claim limitations. ATEN inspected source code on March 23-24, 2015 but did not provide any element-by-element analysis as required by the Patent Rules and did not amend its Original Infringement Contentions to reflect the newly

15

discovered information. (Decl. ¶ 73.) This Court's "Standing Patent Rules seek to balance the parties' rights to develop new information in discovery with the need for certainty in legal theories at an early stage of the case." (Order Granting in Part Defendants' Motion to Strike ATEN's Final Infringement Contentions, Dkt. 345 at 5.) Instead of clarifying its legal theories, ATEN doubled down on its contentions, providing malleable infringement positions to encompass its assertions.  ATEN's unclear infringement position forced Defendants to prepare defenses against an array of potential positions rather than defending against a clearly articulated infringement theory as it is entitled to under the Federal Rules of Civil Procedure and this Court's Standing Patent Rules ("S.P.R.").

### 4. *ATEN's Final Infringement Contentions Violated this Court's Standing Patent Rules*

ATEN's Final Infringement Contentions, disclosed through its expert report, violated this Court's S.P.R., causing unwarranted prejudice and expense to Defendants. First, ATEN disregarded the S.P.R. 4.1 deadline requiring it to disclose its Final Infringement Contentions within 28 days of the Court's April 27, 2016 claim construction order. ATEN did not serve its Final Infringement Contentions until December 16, 2016, more than eight months after claim construction, well after the July 27, 2016 close of fact discovery, after expert reports should have been exchanged, and two years after the Original Contentions were submitted. (Decl. ¶ 31.)

Second, ATEN violated S.P.R. 4.1.2 by amending its Original Contentions without the Court's approval, because its amendments were (1) not a direct result of the April 27, 2016 claim construction order; and (2) not a discovery of nonpublic information that was only recently discovered despite ATEN's diligence. Further, the Final Infringement Contentions were over 1,700 pages long and were submitted just 3 months before the then-existing trial date. (Decl. ¶ 123.) ATEN did not provide a redline against its prior contentions, nor did it submit a statement

16

of reasons for each amendment identifying or explaining any "good cause" for its amendments as required by S.P.R. 4.1.2. (*Id.*)

Third, the Final Infringement Contentions contained material changes from the Original Contentions. For instance, claim 2 of the '217 Patent was asserted for the first time in the Final Infringement Contentions. (Decl. ¶ 124.) ATEN's exceptional disregard for this Court's S.P.R. without providing any justification or good cause for doing so, is unreasonable litigation behavior and prejudiced Defendants.

5. *ATEN Maintained Unsubstantiated Assertions Against the LKV-248*

From November 24, 2014 until December 16, 2016, ATEN contended that the LKV-248 product infringed each of the 27 claims of the '141 Patent. (Decl. ¶ 23.) On February 5, 2015, Defendants submitted their Invalidity Contentions stating that the '141 Patent was invalid under *Vanmoor v. Wal-Mart Stores Inc.*, because the accused LKV-248 was sold before the critical date of the '141 Patent. (Decl. ¶ 24-25.) Defendants' Invalidity Contentions were based, in part, on the declaration of David Vong, who purchased a LKV-248 before the critical date of the '141 Patent. (Decl. ¶ 28.) Defendants notified ATEN's counsel of this prior art and ATEN's counsel inspected the device in March 2015. (Decl. ¶ 29.) Even after being presented with this evidence, ATEN did not withdraw its contentions against the LKV-248 until December 16, 2016, after the close of fact discovery. (Decl. ¶ 31-32.)

The LKV-248 was one of only five products for which ATEN had provided infringement charts, and was presumably representative of dozens of other products. When ATEN refused to withdraw its contention against the LKV-248 under the '141 Patent, Defendants devoted resources to solidify their invalidity defense of the '141 Patent based on the accusation of prior art at the expense of developing other defenses, particularly discovering information about ATEN's

CS1762 prior art device. (Decl. ¶ 33.) Defendants' decision to tailor discovery was necessary considering the magnitude of the assertions levied against Defendants and Defendants' limited resources. (*Id.*) ATEN's disingenuous assertion of the LKV-248 and its delayed withdrawal prejudiced Defendants through the remaining litigation and trial.

6. *ATEN's Refusal to Vacate the Trial Date Despite Uncertainty of the Scope of the Trial Increased Litigation*

When it became clear that trial preparation on the more than 125 accused products would become unnecessary if Defendants' Motion to Strike ATEN's Final Infringement Contentions was granted, Defendants requested a joint stipulation with ATEN to vacate the trial date to permit narrowing of the issues before trial. (Decl. ¶ 126.) ATEN refused. (*Id.*) Consequently, Defendants conducted expedited trial preparation on all accused products, incurring significant costs. (*Id.*) Ultimately, the Court moved the trial date, and ATEN's Final Infringement Contentions were stricken in part, making portions of Defendants' trial preparation unnecessary. (Dkt. 344; Dkt. 345.) ATEN's refusal to reasonably narrow triable issues required a start-stop approach to litigation that ran up costs.

7. *ATEN's Technical Experts Took Contrary and Unreasonable Positions Regarding the '287 Patent*

During claim construction, ATEN took the position that the products accused of infringing the '287 Patent were incapable of synchronous switching where "the data stream passing between the first computer system and the peripheral device is left uninterrupted at the time of switching." (Dkt. 93 at 20.) ATEN's first expert, Mr. Narad, claimed that uninterrupted switching was "not implementable" and impossible under the patents. (Dkt. 93-1 ¶ 81.) Defendants developed their noninfringement and invalidity arguments in light of the representations made by ATEN and its technical expert. (Decl. ¶ 119.) After Mr. Narad's passing, ATEN employed Dr. Lavian as its technical expert. While Mr. Narad asserted that "[w]hen synchronous switching occurs, any connection

between a switched peripheral device and a host computer is **necessarily changed or interrupted**" (Dkt. 93-1 at 5), Dr. Lavian claimed "[t]he accused instrumentalities have console devices that can be switched **either synchronously** or asynchronously with one peripheral device to the same computer system or to different computer systems, **without interruption of the signal to the peripheral device**." (Decl. ¶ 120.) ATEN's decision to take contrary infringement positions after claim construction and fact discovery is exceptional, and Defendants should not bear the costs incurred responding to such behavior.

### d. ATEN's Unreasonable Litigation Behavior Required Additional Motion Practice in the Lead-Up to Trial

#### 1. ATEN Tried to Expand Product Groupings Days Before Trial

Because of the persisting uncertainty regarding ATEN's accused product groupings, the Court ordered the parties to meet and confer and submit proposed groupings of representative and linked accused products in its Order granting in part Defendants' Motion to Strike. (*See* Dkt. 345.) On March 24, 2017, the parties submitted their Respective Proposed Representative and Linked Products. (Dkt. 350.) During the Final Pretrial Conference on June 5, 2017, the parties and the Court discussed how representative and linked accused products would be treated at trial. (Decl. ¶ 142.) Both sides were heard and the Court entered an Order on June 13, 2017 (almost 3 years after the case was filed and only months before trial) clarifying the product groupings. (Dkt. 399 at 5-6.) Neither ATEN's proposed groupings nor the Court's Order included Black Box KV7021A-K, Black Box KV07020A-K, Linkskey LKV-9304, Linkskey LKV-9308, or Linkskey LKV-9316. (*Id.*)

A week before trial, the parties discussed joint jury instructions. (Decl. ¶ 143.) ATEN's proposal for accused products included, **for the first time**, Black Box KV7021A-K, Black Box KV07020A-K, Linkskey LKV-9304, Linkskey LKV-9308, and Linkskey LKV-9316. Defendants filed a Motion in Limine to

19

Exclude ATEN from Expanding its Previously Identified Representative and Linked Product Groupings. (Dkt. 420.) The Court heard oral argument on the motion and granted it during trial. (Tr. 9/20 Vol.1 at 13:7-8.) Circumventing joint proposals to accuse products on the eve of trial is exceptional and forced Defendants to spend valuable time before trial responding to the tactic.

## 2. *ATEN Asserted an Abnormally Weak Lost Profits Opinion*

ATEN prolonged this case by presenting frivolous and unreasonable damages positions. ATEN's damages report claimed over $3 million in lost profits, despite having an incomplete, unsupported lost profits analysis. ATEN's damages expert, Mr. Snell, admits that he lacked sufficient data to undertake the market share analysis necessary to determining lost profits. (*See* Dkt. 297-2 at 17) ("I have not been able to identify market share data that would allow me to estimate the portion of sales that ATEN would have made.") Undeterred, he invented an alternate theory of product "mapping." The Court rejected this wholly insufficient theory because it used "multiple layers of guesswork" and "does not embody the use of sound economic principles." (Dkt. 363 at 5.)

Mr. Snell also admits that ATEN has competitors other than Defendants, but he ignored those competitors, concluding that ATEN would have made <u>every</u> sale that Defendants made did but for Defendants' alleged infringement. (*See Id.* at 4-5.) Mr. Snell's lost profits analysis also failed to recognize the many, acceptable design-arounds as non-infringing substitutes or that Uniclass's sales to ATEN's licensees are acceptable non-infringing substitutes, both of which thwart the second *Panduit* factor. (*See* Dkt. 264-2 at 16-20.) ATEN asserted Mr. Snell's lost profits opinion despite its fatal flaws, and Defendants and their expert spent significant resources defending against and dismissing the opinion. Defendants should not be forced to bear the burden of responding to such meritless claims.

## e. *ATEN's Exceptional Litigation Behavior Led to an Expensive and Disproportionate Trial*

1                          1. _ATEN Trial Costs were Disproportionate to the Damages Requested at Trial_

2          ATEN's litigation behavior produced disproportionately high legal fees in

3    relation to the requested damages. At trial, ATEN's damages expert admitted that

4    at most ATEN was entitled to $678,337 in reasonable royalty damages. (Tr. 9/22

5    Vol.2 at 90:14-15.)  Considering the limited damages at issue, Defendants tried to

6    settle this suit several times to conserve the resources of the parties, the Court and

7    the jury. (_See_ Decl. ¶¶ 153-54.) However, ATEN sought a settlement exceeding

8    what it could potentially recover at trial along with an injunction on all accused

9    products, even on products that had been dismissed with prejudice from the case.

10    (_Id._) ATEN's unwillingness to entertain serious settlement discussions resulted in

11    an unnecessary and expensive trial.

12          Highlighting the disproportionality of this case, ATEN spent more on expert

13    witnesses than the damages it requested at trial. ATEN's technical expert

14    confessed that he believed that he had billed over $400,000 in this case. (Tr. 9/22

15    Vol.2 at 8:2-5.) ATEN's damages expert testified that his firm has billed over

16    $300,000. (Tr. 9/26 at 23:9-12.) Combined, these two experts billed ATEN over

17    $700,000, not including their trial time. This figure is larger than ATEN's

18    maximum recovery at trial and does not include the time billed by Dr. Lavian's

19    two assistants, ATEN's first technical expert, ATEN's five different law firms

20    over three years of litigation, or the costs inherent in a two-week trial. ATEN's

21    insistence on outspending any possible recovery and eschewing reasonable

22    settlement exposes it to exceptionality and reimbursement of fees and expenses of

23    the Defendants. _See Universal_, 2015 WL 12733442 at *2 (awarding fees and

24    expenses when "evidence at trial showed that this litigation was at least in part

25    motivated by Plaintiff's desire for 'payback' for Defendant's successful

26    competition in the marketplace. . .")

27

28

                                       21

During the Jury Instruction hearing on 9/25/2017, this Court noted that it was "exceedingly cautious" about how to allow ATEN to proceed at trial because of the disproportionate costs and fees incurred by all parties because of ATEN's litigation and trial behavior:

> . . .We're asking a lot of these citizens. We're asking a lot of this courtroom. We're asking a lot of free services to be provided to you, and I'm not sure it makes sense to be providing free services of $700,000 in a $650,000 case. I don't know why this case hasn't settled. I don't know why the plaintiff has spent over $400,000 on one expert. **That makes me exceedingly cautious about how much I allow you to use this courtroom and this jury**. . . . When I was a lawyer, if I did that, I would be fired . . .

(Tr. 9/25 at 12:16-13:4, emphasis added.)

ATEN's counsel confirmed that ATEN's unusual litigation behavior was driven by anti-competitive strategy rather than a justifiable legal recourse:

> . . . These two parties are competitors . . . . and **there's I think some animosity here**. It's unfortunate that it has come to this point, but **the parties are strong competitors in this KVM OEM market, and they see this as being an important, you know, statement against each other** . . .

(*Id.* at 13:8-17, emphasis added; *see also* Tr. 9/20 Vol. 1 at 73:13-22.) The Court, acknowledging the inappropriateness of ATEN's motivation, warned ATEN, ". . . this is a courtroom that resolves disputes and doesn't necessarily vindicate revenge amongst competitors." (Tr. 9/25 at 13:20-21.)

Later, the Court reiterated its puzzlement at ATEN's trial strategy:

> THE COURT: I'm wondering -- we're debating between 650 [thousand] and 75,000 [dollars]; right? We've got at least five attorneys over here on the plaintiff side. I don't know what their average billing rate is. Gosh, this doesn't seem to be effective. **I have just never seen anything like this** . . . . I just -- we're spending so much time on this.

 (Tr. 9/28 at 102:15-21, emphasis added.) The manner in which ATEN litigated the entire case, shown again at trial, manifests that the case is exceptional and is set apart from run-of-the-mill cases. (*See also* Tr. 9/27 at 80:12-22, the Court expressing concerns over "proportionality.")

> ### 2. *ATEN's Abnormally Meritless Damages Position at Trial*

ATEN's reasonable royalty opinion lacked even a basic *Georgia-Pacific* analysis. Mr. Snell's reasonable royalty opinion hinged on the assumption that the parties conducted independent *Georgia-Pacific* analyses before entering their respective licenses, thus relieving him of the burden of conducting his own analysis. (*See e.g.,* Tr. 9/26 at 34:20-35:2.) However, Mr. Snell failed to provide any testimony or evidence establishing that any party conducted a *Georgia-Pacific* analysis before finalizing the license agreement. Instead, Mr. Snell dedicated an inordinate amount of his trial testimony to reading product numbers, undisputed royalty bases, and applying his conclusion of a 7.5% royalty basis – simple math directly from his slides.  This exercise provided no evidentiary basis regarding his methodology, analysis or opinion. Rather, the wastefulness and unsupported nature of that testimony epitomized ATEN's litigation behavior.

At trial, Mr. Snell made no effort to list or analyze the *Georgia-Pacific* factors or to explain the impact that those factors had on his conclusions, and the sparse expert analysis that Mr. Snell did provide was incomplete. Mr. Snell ignored 2 of 5 ATEN license agreements: with Belkin (*id.* at 45:3-6) and StarTech (*id*. at 44:23–45:2) despite their similarities to the present case, involving the same technology. When asked if his analysis of the *Georgia-Pacific* factors were consistent with his conclusions, Mr. Snell responded, "**I'm not sure how to answer that**." (*Id.* at 128:2, emphasis added.) Notably, Mr. Snell did not consider *Georgia-Pacific* Factor 8 (profitability). (*See* Tr. 9/26 at 68:5-12.) When Mr. Snell finally did consider the impact that the parties' profitability has on a reasonable royalty rate, he admitted, "[i]f it was an incremental profit margin of 8 percent,

then **a 7.5 percent royalty rate would probably be too high**." (*Id.* at 69:3-5, emphasis added.)

ATEN claimed that 7.5% was a reasonable royalty primarily because ATEN and Uniclass had entered a patent license for a 7.5% royalty in 2009. (Tr. 9/22 Vol.2 at 97:15-18.) In making this assertion, ATEN overlooked clear differences between the 2009 license and the hypothetical negotiation at issue in this case, including the amended rate to the May 2009 license the same day, the difference in patent rights granted in the hypothetical license and the May 2009 license, the impact the threat of litigation had on the May 2009 license, and the escape provision in the May 2009 license allowing Uniclass to be relieved from all further obligations should all claims of the licensed patents be materially limited or declared invalid. Instead of considering these mitigating factors, ATEN simply selected the highest royalty listed in any of its licenses and crudely applied it to the present case without independent analysis. Defendants should recover their fees and costs responding to these baseless damages positions.

### 3. *ATEN's Inconsistent Infringement Theories in Trial Resulted in Nonsensical Damages Request at Trial*

On May 19, 2017, Defendants filed a Motion to Sever and Exclude Claims against Defendants other than Uniclass Technology Co., Ltd. (Dkt. 369.) ATEN vigorously opposed that motion, despite only conducting limited discovery of the customer defendants and not deposing any witnesses from those companies. (Dkt. 376; Decl. ¶¶ 139-40.) By trial, ATEN no longer asserted products against some of the customer defendants. Rather than dismissing those defendants against which ATEN had no standing, ATEN added accused products into the jury instructions days before trial to keep the defendants in the case, spurring unnecessary briefing and argument. (Decl. ¶ 143.) At trial, ATEN did not call any witnesses from the customer defendants and did not present any evidence related to the alleged infringement of those companies. (Decl. ¶ 140.)

ATEN kept the customer defendants in the case, despite unusually low damages. At trial, ATEN's damages expert testified that at most Airlink 101 owed $6,818 in damages. (Tr. 9/26 at 26:11-13.) Mr. Snell also testified that if the notice date for infringement was determined to be August 7, 2014, then the maximum damages for which Airlink would have been liable was only $261. (*Id.* at 41:8-12.) Despite Defendants' attempts to settle or sever this case, ATEN demanded a jury trial for all Defendants involved, increasing costs for all parties.

C. <u>Defendants should be Awarded their Attorney Fees and Expenses, with the Specific Amounts to be Determined at a Later Date</u>

Pursuant to Fed. R. Civ. P. 54(d)(2)(C), Defendants respectfully request that the Court decide only liability for attorney fees at this time. Defendants request that briefing regarding the amount and reasonableness of its attorney fees and expenses be set for a later date – a procedure the Court has allowed in prior cases. *See, e.g., Universal,* 2015 WL 12733442 at *8. Bifurcation under Rule 54(d)(2)(C) will enable the parties to tailor their evidentiary presentation to the Court's liability decision, thus streamlining the process and avoiding unnecessary expenditures of resources and paperwork. Accordingly, this brief does not address the amount or reasonableness of Defendants' attorney fees or expenses. Defendants are ready to provide further briefing and evidence on such issues at the Court's instruction.

## IV.   CONCLUSION

For the above reasons, Defendants respectfully request that the Court issue an order awarding Defendants their reasonable attorney fees and expenses under 35 U.S.C. § 285, including expert witness fees, and fees and expenses associated with the present motion, and setting a schedule for additional submissions regarding the specific amount of fees and expenses to be awarded.

Dated: January 15, 2018                    Respectfully submitted,

/s/ Joseph G. Pia

25

1  
2  
3  
4  
5  
6  
7  

Joseph G. Pia
Attorney for Defendants
UNICLASS TECHNOLOGY CO., LTD.,
ELECTRONIC TECHNOLOGY CO.,
LTD. OF DONGGUAN UNICLASS,
AIRLINK 101, PHOEBE MICRO INC.,
BROADTECH INTERNATIONAL CO.,
LTD. D/B/A/ LINKSKEY, BLACK BOX
CORPORATION, and BLACK BOX
CORPORATION OF PENNSYLVANIA

8  

9  

## <u>CERTIFICATE OF SERVICE</u>

10  
11  
12  
13  

The undersigned hereby certifies that a true and correct copy of the above
and foregoing document has been served on January 15, 2018 to all counsel of
record who are deemed to have consented to electronic service via the Court's
CM/ECF system per Local Rule CV-5(a)(3).

14  

15  
16  

<u>/s/ Joseph G. Pia</u>

17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

26