Robert Aycock (*pro hac vice*)
raycock@pa-law.com
Joseph G. Pia (*pro hac vice*)
joe.pia@pa-law.com
William B. Chadwick (*pro hac vice*)
wchadwick@pa-law.com
PIA ANDERSON MOSS HOYT
136 East South Temple, 19th Floor
Salt Lake City, UT 84111
T: 801-350-9000
F: 801-350-9010

[Additional counsel listed on signature page]

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATEN INTERNATIONAL CO., LTD. | No. 2:15-cv-04424-AJG-AJW |
| Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR EXCEPTIONAL CASE DETERMINATION UNDER 35 U.S.C. § 285** |
| vs. | |
| UNICLASS TECHNOLOGY CO., LTD., et al. | |
| Defendants. | Judge: Hon. Andrew J. Guilford |
| | Hearing: February 26, 2018 at 10:00AM |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................. 1

II.  ARGUMENT ....................................................................................... 2

    A.   Defendants' Motion Should Not Be Denied as Untimely .......................... 2

    B.   Defendants Successfully Showed that ATEN Did Not Conduct an
        Adequate Pre-Filing Investigation ................................................. 3

    C.   Defendants Successfully Showed that ATEN Unnecessarily Increased the
        Costs of Claim Construction ...................................................... 12

    D.   Defendants Successfully Showed that ATEN's Changes in Counsel and
        Infringement Positions Drastically Increased Costs ............................. 13

    E.   Defendants Successfully Showed that ATEN's Litigation Behavior was
        Unreasonable Requiring Unnecessary Motion Practice Leading Up to
        Trial ............................................................................... 20

    F.   Defendants Successfully Showed that ATEN's Litigation Behavior was
        "Exceptional" and "Led to an Expensive and Disproportionate Trial" .... 21

III. CONCLUSION ................................................................................... 23

i

# TABLE OF AUTHORITIES

**Cases**

*Aleksander L. Yufa  v. TSI, Inc.*,

  No. 12-cv-1614-FMO (C.D. Cal. Aug 12, 2015) .......................................... 6

*ATEN Int'l Co. Ltd., et al. v. Emine Tech Co. Ltd., et al.*

  No.09-cv-0943-AG (C.D. Cal 2009) ....................................................... 12

*Edwards Lifesciences AG v. CoreValve, Inc.*,

  699 F.3d 1305 (Fed. Cir. 2012) .......................................................... 18

*Envosys LLC v. AT&T Mobility LLC*,

  2016 WL 3460794 (C.D. Cal. 2016) ........................................................ 7

*Kinglite Holdings, Inc. v. Micro-Star Intl' Co. Ltd.*,

  No. 14-cv-03009-JVS (C.D. Cal. June 23, 2016) .............................. 6, 10

*Lucent Techs., Inc. v. Gateway, Inc.*,

  580 F.3d 1301 (Fed. Cir. 2009) ......................................................... 23

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,

  467 F.3d 1355 (Fed. Cir. 2006) ......................................................... 16

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,

  134 S.Ct. 1749 (2014) ...................................................................... 1

*Q-Pharma, Inc. v. Andrew Jergens Co.*,

  360 F.3d 1295 (Fed. Cir. 2004) ...................................................... 3, 4

*Refac Intern., Ltd. v. Hitachi Ltd.*,

  141 F.R.D. 281 (C.D. Cal. May 31, 1991) ............................................. 5

*SFA Sys., LLC v. Newegg Inc.*,

  793 F.3d 1344 (Fed. Cir. 2015) .......................................................... 1

*Sonix Tech. Co. Ltd., v. Yoshida*,

  No. 12-cv-380-CAB, Dkt. 348 (S.D. Cal. May 23 2016) ......................... 19

*TechRadium, Inc., v. FirstCall Network, Inc.*,

  2015 WL 862326 (S.D. Tex. 2015) .................................................. 7, 12

*Whitserv, LLC v. Computer Packages, Inc.*,

    694 F.3d 10 (Fed. Cir. 2012) ................................................................... 22

**Statutes**

35 U.S.C. § 282 ........................................................................................... 8

35 U.S.C. § 285 ......................................................................................... 23

**Rules**

Fed. R. Evid. 602 ........................................................................................ 1

**Regulations**

37 C.F.R. 1.56 ............................................................................................. 9

# I.  **INTRODUCTION**

Defendants hereby submit their reply in support of their Motion for Exceptional Case Determination (Dkt. 479, "Motion" or "Mot.") and in response to the Opposition filed by ATEN International Co., Ltd. ("ATEN") (Dkt. 483, "Opposition" or "Opp.")

ATEN's Opposition fails to refute the exceptional nature of this case. ATEN claims that its litigation behavior was reasonable and in good faith, but it only supports this contention with inadmissible argumentation from its most recent counsel that lack personal knowledge of most of ATEN's exceptional actions as they only joined this case shortly before trial. *See* Fed. R. Evid. 602. ATEN tries to explain away over three years of vexatious litigation with over-simplified conclusions and fails to address many of Defendants' arguments.

ATEN brought a large, aggressive case without first conducting a reasonable investigation and then refused to reassess and streamline its infringement contentions during litigation. These two failures unnecessarily increased costs and prejudice to Defendants at every stage of litigation making this case "exceptional based on unreasonable and vexatious litigation tactics, even [if] the legal theories advanced are not objectively baseless," *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1349 (Fed. Cir. 2015). "[C]onsidering the totality of the circumstances," this case is exceptional "with respect to the substantive strength of [ATEN]'s litigation position" *and* "the unreasonable manner in which the case was litigated" entitling Defendants to their attorney's fees and costs. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1756 (2014).

ATEN's disproportionate litigation strategy included accusing 127 products without investigating the products or claims, forum shopping to relitigate settled claim construction issues and avoid this Court, asserting an erroneously issued patent claim, accusing different products from the ones its expert examined and refusing to amend its contentions when it was notified of this mistake, switching counsel over five times without ensuring continuity, presenting a damages case that relied on "multiple layers

of guesswork," filing Final Infringement Contentions in violation of the Court's Standing Patent Rules ("S.P.R."), presenting contradictory expert opinions that obfuscated its infringement and validity positions, attempting to change agreed-upon product groupings days before trial, outspending any potential recovery to overwhelm a small competitor, and other misbehavior that unnecessarily increased costs for the Court, the public, and Defendants.

ATEN's deliberate litigation strategy thwarted the purpose of the Court's S.P.R. "to balance the parties' rights to develop new information in discovery with the need for certainty in legal theories at an early stage of the case." (Dkt 345 at 5.) The persisting uncertainty as to ATEN's infringement theories forced Defendants to defend against a broad range of possible theories through most of litigation, incurring needless expenses to combat ATEN's overwhelming legal attack. ATEN's exceptional tactics and positions, as a whole, justify Defendants' request for fees.

## II.   ARGUMENT

### A.   Defendants' Motion Should Not Be Denied as Untimely

Defendants filed their Motion nine minutes after midnight on January 15, 2018 (a federal holiday) because of technical difficulties with the CM/ECF filing system. The attachments to the Motion were filed minutes afterwards. On January 17, 2018, Defendants received a notice of deficiencies (Dkt. 478) for failure to include a proposed order and a proposed hearing date. After obtaining instructions from the Courtroom Deputy, Defendants filed a corrected notice of motion with the proposed hearing date, a proposed order, and the identical Motion, declaration, and exhibits as one docket entry for ease of reference. Defendants combined the eight declaration exhibits (previously filed as Dkts. 475-76) into one document (Dkt. 479-4) and added coversheets between each exhibit, again, for ease of reference. These modifications were not "deceptive." The exhibits filed in Dkt. 479-4 are the exact exhibits filed as Dkts. 475-476.

ATEN offers no evidence that it suffered any prejudice stemming from the filings. In fact, since at least August 31, 2017, ATEN had notice of Defendants' intent

1  to move for fees. (Dkt. 479-4 at 113-29, Notice and Demand Letter.) This notice also

2  provided a detailed analysis of the arguments that Defendants would and did make in

3  the present motion. Because the filings were delayed by only a few minutes and caused

4  no prejudice to ATEN, and because ATEN has had notice of Defendants' positions

5  months before the filing, Defendants' motion should not be dismissed as untimely.

6       Notably, the Court has previously declined to dismiss untimely filings in this

7  case. During the dispositive motion phase of this case, ATEN filed its opposition to one

8  of Defendants' motion for summary judgment several hours late. (Dkt. 302.) ATEN

9  also had technical issues with that filing and took several days to correct it. (Dkts. 302-

10 03, 326-34.) Because Defendants had adequate notice and experienced no prejudice,

11 they raised no objection and the Court did not dismiss ATEN's filings as untimely.

12      **B.   Defendants Successfully Showed that ATEN Did Not Conduct an**
        **Adequate Pre-Filing Investigation**

13

14      ATEN's inadequate pre-filing investigation prejudiced Defendants and increased

15 the costs of litigation. In its Opposition, ATEN argues that it "conducted a good-faith

16 pre-filing investigation" and that it brought this lawsuit "upon completing a good-faith

17 comparison of all its asserted claims against Uniclass' products." (Opp. at 4.) ATEN

18 provides no declaration or documentation from any witness or any of its previous

19 counsel to support the existence, methodology, or good faith of the alleged

20 investigation. ATEN relies on *Q-Pharma, Inc. v. Andrew Jergens Co.* to justify its

21 inadequate pre-filing investigation because that case holds, "an infringement analysis

22 can simply consist of a good faith, informed comparison of the claims of a patent against

23 the accused subject matter." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295,

24 1302 (Fed. Cir. 2004). (Opp. at 3-4.) In *Q-Pharma*, the adequacy of plaintiff's pre-

25 filing investigation was established by a declaration from plaintiff's expert identifying

26 how he and plaintiff's attorney "interpreted and analyzed the '373 patent **before** Q-

27 Pharma filed suit . . . . [and] review[ed] the patent's claims, written description, and

28 prosecution history and interpret[ed] the individual claim terms." *Q-Pharma*, F.3d at

3

1301 (emphasis added). When similarly accused of not conducting an adequate pre-filing investigation, ATEN provides no such declaration in response. ATEN bases its defense on unsupported conclusions from its present counsel—that were retained shortly before trial—without any evidence from its prior counsels which would have been responsible for the pre-filing investigation.

ATEN's only argument for the sufficiency of its pre-filing investigation is that its May 2009 license with Uniclass arose from "extensive discussions" between the parties regarding Uniclass' products. (Opp. at 4.) But, Uniclass's President testified at trial that even after entering the May 2009 license, ATEN failed to provide any explanation as to how Uniclass's products met every limitation of the licensed patents. (Tr. 9/26 at 90:5-9, 17-19.) ATEN also fails to cite any evidence, declaration, trial testimony, or exhibit that supports that these alleged discussions took place or constituted the necessary "good faith, informed comparison of the claims of a patent against the accused subject matter." *Q-Pharma*, F.3d at 1302.

ATEN provides no support that there were "extensive discussions" sufficient to satisfy its pre-filing investigation obligation as to all 127 accused products, and the May 2009 license only lists five products. (Tr. Ex. 5.) ATEN should have performed a documented investigation of infringement and validity (particularly against its own prior art products) before instituting this litigation against a litany of products. ATEN gives no evidence that it did so, and cites no authority supporting the idea that contract negotiations in 2009 may substitute for an adequate pre-filing investigation for its patent infringement suit filed five years later.

ATEN's justification for substituting contract negotiation with an infringement analysis relies on an unsubstantiated assumption that all accused products infringed at the time the parties entered the May 2009 license and *that was why the license was formed*. This conclusory rationale does not excuse ATEN's obligation to conduct a pre-filing infringement analysis. Contrary to ATEN's assumptions, the May 2009 license created no inherent presumption of validity or infringement of the licensed patents.

Obviously, there had not been a judicial ruling that the products subject to the 2009 license infringed the patents-at-issue, or that the license was entered into for any reason other than settlement of a dispute. (Tr. 9/26 at 87:18-25.) ATEN's justification also overlooks Uniclass' reasons for entering the license such as fear of expensive litigation. (*Id.* at 91:19-24.) As described below, ATEN's inadequate pre-filing investigation led to meritless infringement positions, unreasonable litigation behavior, and prejudice to Defendants and supports a finding of exceptionality. *See Refac Intern., Ltd. v. Hitachi Ltd.*, 141 F.R.D. 281, 286 (C.D. Cal. May 31, 1991) (awarding attorney's fees where plaintiff "assumed without justification that all of the accused products violated one or more of its patents, but made no reasonable (or any) investigation to confirm this.")

## 1. <u>ATEN Only Provided Claim Charts for Five of the 127 Accused Products</u>

ATEN argues that "[t]he Standing Patent Rules do not require a claim chart for every accused product." (Dkt. 345 at 5-6). Still, ATEN must "provide enough information to permit a reasonable inference that all accused products infringe." (*Id.* at 6.) ATEN's five claim charts did not permit a reasonable inference that all accused products infringed, particularly considering the differences between the many products and ATEN's limited explanations as to how the charted products represented the other 96% of the products. After nearly two and a half years, ATEN eventually provided more complete claim charts, but included little information that it would not have been able to provide had it conducted an adequate pre-filing investigation. ATEN's limited analysis and unreasonable delay in providing more complete charts forced Defendants to go through claim construction and all of fact discovery without notice of all of ATEN's infringement theories, which supports a finding of an inadequate pre-filing investigation, unreasonable litigation behavior, and an exceptional case determination.

## 2. <u>ATEN's Inadequate Pre-Filing Investigation Led to Broad Accusations that Were All Dropped, Dismissed, or Unsuccessful</u>

ATEN brought an extremely broad lawsuit without performing sufficient due diligence on the products it accused, requiring Defendants to respond to extensive

accusations on myriad products that simply could not infringe ATEN's patents. Through successful motion practice, Defendants removed a significant portion of the originally accused products and claims before trial. (*See* Dkt. 345.) The dismissal of ATEN's accusations (whether on the merits or on procedure) highlights ATEN's unreasonable lack of diligence in identifying potentially infringing products in its pre-filing investigation and amending its infringement contentions as new information became available. When taken as part of the totality of the circumstances, ATEN's unnecessary multiplication of the proceedings with unfounded infringement allegations supports a finding of exceptionality.

### 3. ATEN Failed to Examine the Accused Products

ATEN's Opposition provides no argument, declaration, or evidence that it purchased or examined any of the products before filing suit.. Courts in this district have found that a failure to analyze publicly available products to identify alleged infringement or to establish how products are representative, demonstrates an inadequate pre-filing investigation and exceptional litigation behavior. For example, in *Aleksander L. Yufa v. TSI Inc.*, No. 12-cv-1614-FMO, at 3 (C.D. Cal. Aug. 12, 2015), the court held that the plaintiff's failure to purchase or test any accused products before filing lawsuit weighs in favor of exceptionality. *See also Kinglite Holdings Inc. v. Micro-Star Intl' Co. Ltd.*, No. 14-cv-03009-JVS, at 10-11 (C.D. Cal. June 23, 2016) (finding exceptionality where plaintiff's expert witness did not inspect the accused products and where plaintiff could have easily confirmed accused elements before filing suit.)

ATEN's deficient pre-filing investigation continued into its expert analysis. ATEN's technical expert, Dr. Lavian, stated that he only personally used "the Uniclass PrimaT8 8-port device, the Linkskey LKV-248AUSK 4-port device, and the small 2-port USB KVM switches." (Dkt. 336 at 9, ¶ 31.) However, at trial, Dr. Lavian confessed that he had not actually used all of his previously listed devices. (Tr. 9/22 Vol.1 at 51:3-55:1.) ATEN's new position in its Opposition is that it did not need to examine the

products before or after filing suit, "where ATEN examined the products' source code, schematics, and manual." (Opp. at 6.) This assertion contradicts Dr. Lavian's testimony that, "***it's very important to actually take the device and actually see if it does what it's supposed to do.***" (Tr. 9/20 Vol.2 at 72:19-21, emphasis added.) ATEN provides no support that it had access to or examined the source code, schematics, or manuals before filing the lawsuit, and indeed complained on multiple occasions after the close of fact discovery that it did not have sufficient source code to complete Dr. Lavian's expert report. (Dkt. 479-3, Declaration of Robert E. Aycock in Support of Defendants' Motion to Declare This Case Exceptional, at ¶¶ 88-99, 105-112.) ATEN's position appears to be that because it *could have* accessed manuals and schematics prior to filing, its prefiling investigation was adequate without providing any evidence that it actually access those materials before filing.

### 4.  ATEN Asserted and Maintained the Erroneously Issued Claim 45 of the '275 Patent Through Claim Construction Briefing

ATEN's assertion of claim 45 of the '275 Patent, an erroneously issued claim that should have been discovered in basic pretrial investigation, and its refusal to withdraw the claim despite having early notice of the claim's deficiencies, is exceptional and any infringement contention based on claim 45 was meritless. To determine exceptionality, "[t]he factors courts look to include whether a party knew or willfully ignored evidence of the claims' meritlessness; whether the meritlessness could have been discovered by basic pretrial investigation; or whether the meritlessness was made clear early in the litigation." *Envsys LLC v. AT&T Mobility LLC*, 2016 WL 3460794, at *6–7 (C.D. Cal. 2016) (citing *TechRadium, Inc., v. FirstCall Network, Inc.*, 2015 WL 862326, at *6 (S.D. Tex. 2015).

ATEN's maintenance of the '275 Patent past claim construction briefing created voluminous and unnecessary litigation. In its Original Infringement Contentions, ATEN accused over 100 of Defendants' products of infringing just claim 45 (*see* Dkt. 253 at 6-7) and identified more than 80 of its own KVM switches that practiced claim 45 (*id.*

at 22-23). To respond, Defendants were forced to conduct analyses on every identified product. Additionally, ATEN's assertion of claim 45 spurred extensive review of prior art patents, products, and publications as Defendants prepared invalidity contentions on that claim. Had ATEN conducted an appropriate pre-filing investigation or dropped the claim after receiving notice of the claim's erroneous issuance, Defendants could have avoided this mountain of work.

In its Opposition, ATEN does not argue that it performed a pre-filing investigation of claim 45. ATEN's only explanation for asserting claim 45 is that patents have a "presumption of validity." This presumption does not apply because claim 45 was never examined or allowed by the USPTO and was published through error. ATEN was the original assignee of the '275 Patent and should have realized that this claim was erroneously issued and thus did not carry the presumption of validity under 35 U.S.C. § 282. Still, ATEN unreasonably maintained its assertion of claim 45 for four months after Defendants notified ATEN of the erroneous issuance. ATEN provides two unavailing explanations for this delay: (1) the time required to conduct a thorough investigation, and (2) the size of the case. (Opp. at 8.) Both excuses were in ATEN's control and neither redeems ATEN's maintained assertion of a facially invalid claim after being put on notice.

First, the "thorough investigation" of the legitimacy of the asserted claims should have been done *before* filing, not while Defendants were spending resources to defend against those claims. Even if ATEN's investigation was conducted after filing, it should have been done promptly and diligently. Four months is an unreasonable length of time to confirm the status of one patent claim, particularly when Defendants provided a detailed explanation in their invalidity contentions of how claim 45 is not a valid or enforceable claim and when the scope of claim construction depended on the outcome of the investigation. (Dkt. 479-4 at 11-14; Dkt. 479-3 at ¶¶ 16-17.)

Second, ATEN's attempt to blame Defendants' prejudice on the size of the case is disingenuous and revealing of ATEN's exceptional behavior. ATEN dictated the size

8

of this case and elected to assert claim 45 and six patents in total, including over 60 claims that each required extensive analysis. ATEN's decision to bring an unwieldy case without properly vetting it led to a ***four-month*** post-filing investigation to confirm a basic element of its own '275 Patent.

Once ATEN finally completed its investigation, it filed a joint stipulation to dismiss the '275 Patent with prejudice. (Dkt. 157.) Ignoring the reality that claim 45 is unenforceable, and at best invalid, ATEN falsely publicized that it only agreed to the dismissal because the Court's claim construction briefing limitations prevented it from pursuing the claim. (*See* Dkt. 479-4 at 17, where ATEN represented to the Taiwanese court that its decision to drop claim 45 "was reached only because appellee's proposed claim terms for claim construction exceeded the requirement set by the Court.") ATEN's conduct and failure to fix its mistakes and dilatory investigation has led to a ripple effect of prejudice that contributes to a finding of exceptionality.

### 5. ATEN Asserted the '141 Patent that was Invalidated by ATEN's CS1762 Product

ATEN's inadequate pre-filing investigation led it to assert the '141 Patent which was invalidated by its own prior art product. (*See* Dkt. 481 at 4-5.) ATEN does not respond with evidence that it had a good faith basis to believe that the '141 Patent's critical date predated the CS1762 device. Instead, ATEN gives two reasons for asserting the '141 Patent: (1) it presumed its patent to be valid, and (2) it believed that Defendants would not be able to prove invalidity of the '141 Patent based on the evidence in the record.

The presumption of validity of the '141 Patent is overshadowed by ATEN's own obligations under 37 C.F.R. 1.56 to disclose to the USPTO information material to patentability of the '141 Patent, including potential prior art. ATEN did not disclose its CS1762 device to the USPTO and failed to provide contextual evidence of the device during discovery. This unfairly shifted the burden to Defendants to prove through expensive and time-consuming third-party research and expert testimony what ATEN should have known all along: that ATEN's CS1762 device invalidated the '141 Patent.

Despite manufacturing the CS1762 device, ATEN did not produce any evidence at trial or in its Opposition to show that the CS1762 device did not predate the '141 Patent. By contrast, Defendants provided clear and convincing evidence at trial to convince the Jury that the CS1762 *did* predate the '141 Patent. (Dkt. 481 at 4-5.) ATEN's assertion of a patent invalidated by its own product demonstrates an inadequate pre-filing investigation, a meritless infringement position, and exceptional litigation behavior.

### 6. ATEN Analyzed the Prima 8 Product While Accusing the Prima T* Products

ATEN accused the Prima T4, Prima T8, and Prima T16 of infringement, while analyzing the distinct Prima 8 device. ATEN's failure to analyze the correct accused product weighs in favor of a finding of exceptionality. *Kinglite Holdings Inc. v. Micro-Star Intl' Co. Ltd.*, No. 14-cv-03009-JVS, at 10-11 (C.D. Cal. June 23, 2016).

In its Opposition, ATEN inexplicably takes a position contrary to Dr. Lavian's trial testimony and expert report, arguing that "the product Dr. Lavian analyzed was a Prima T8." (Opp. at 10.) ATEN is incorrect. At trial, Dr. Lavian repeatedly admitted that he did not analyze a Prima T8: "Q: So you have never used a Prima T8 product; correct? A: ***No. I used the Prima – as I said, the Prima 8.***" (Tr. 9/26 Vol.1 at 51:3-4, emphasis added); Q: But, again, you have never looked at a Prima T8 product? A: ***Not the specific box***. I used the other revision. (*Id.* at 51:16-18, emphasis added); Q: . . . [W]hen you said that you had a Prima T product on your table, that is not correct? A: ***I had a Prima 8 product, the different revision . . . . But you are correct, I used a different revision of the same box***. (*Id.* at 51:19-52:1, emphasis added.) This testimony was followed by a discussion of the differences between the Prima T and Prima * switches (*id.* at 52:10-14), Dr. Lavian's reasons for not examining the Prima T products (*id.* at 54:5-15), and Dr. Lavian's acknowledgment that it was the Prima T products (and not the Prima * products) that were accused of infringement (*id.* at 54:16-20).

Dr. Lavian's final expert report confirms that he only analyzed the Prima 8 and

not the Prima T8. (*See* Dkt. 479-3 at ¶¶ 35, 37; Dkt. 256-4 at 81-205; Dkt. 256-5 at 1-67.) His report included photos that he identifies as a Prima 8 or LKV-9308 device. (Dkt. 256-4 at 89; Dkt. 256-5 at 1.) Dr. Lavian's identification is also supported by his photos of a ATmega64A microcontroller (Dkt. 256-4 at 89) and a CY763723C emulator (*id.* at 16), both of which are found in the Prima 8 but not in the Prima T8. (Dkt. 479-3 at ¶ 35(d)-(f).)

Defendants notified ATEN of the difference between the Prima * and Prima T* switches on multiple occasions and long before trial (including in its motion to strike Dr. Lavian's testimony (Dkt. 368)), but ATEN refused to update its contentions. (Dkt. 479-3 at ¶ 38.) ATEN still refuses to admit this error in its Opposition. It was not until just days before trial that ATEN, realizing its mistake, tried to insert versions of the Prima * products that Dr. Lavian analyzed into the list of accused products claiming that they are equivalent of the Prima T switches. (§ II.E.1, *infra*.) ATEN's continued assertions against products that it did not examine before or after filing suit and its failure to acknowledge its mistake are exceptional litigation behavior.

### 7. <u>ATEN Accused Defendants' Foreign Sales of the Prima T Products of U.S. Patent Infringement</u>

ATEN claims that its accusations against the Prima T Products were supported by data provided by Uniclass. Any confusion resulting from that data was clarified by counsel on multiple occasions to ATEN's prior and current counsel. (Dkt. 479-3 at ¶ 36.) Nevertheless, ATEN pressed forward requiring extensive non-infringement and invalidity analyses on products that should not have been accused. ATEN does not argue that it purchased or could purchase the Prima T* in the United States, and indeed did not purchase a Prima T8 product for its expert to analyze. (Tr. 9/22 Vol.1 at 54:21-55:5; § II.B.6, *infra*.) ATEN's assertion of infringement against *foreign* sales of the Prima T8 is unreasonable and weighs in favor of an exceptionality determination.

**C.**   **Defendants Successfully Showed that ATEN Unnecessarily Increased the Costs of Claim Construction**

**1.**   **ATEN Forum Shopped and Relitigated Construed Claims**

ATEN does not dispute that it attempted to game jurisdiction and venue to avoid this Court's previous claim construction. ATEN only offers one reasonable consideration for a plaintiff to file in EDTX despite having previously received a claim construction in another district: "an accelerated docket." (Opp. at 11.) Even then, ATEN doesn't argue that it filed in EDTX because of the accelerated docket, just that a plaintiff *could* have valued that consideration.

ATEN argues that the Court's prior claim construction in the *Emine* litigation was vacated requiring it to raise the same arguments in this case to preserve its right to appeal. (Opp. at 13; *see also ATEN Int'l Co. Ltd., et al. v. Emine Tech Co., Ltd., et. al.*, No. 09-cv-0943-AG (C.D. Cal. 2009).) ATEN could have simply stipulated to reinstate the Court's *Emine* claim construction without requiring full briefing and hearing on the already construed terms. Instead, ATEN tried to relitigate settled claims and compelled wasteful briefing and construction, because, as the Court noted, "[t]here doesn't appear to be any good reason for the Court's earlier analysis to apply differently now. . . . [N]othing has occurred that would change the scope or construction of the claims." (Dkt. 226 at 10, citation omitted.)

As another district court has found, "arguments for a different construction [of already construed claims] in the present cases were wholly unsubstantial and without merit. This ***strongly supports*** finding these consolidated cases exceptional. It was merely a vehicle to relitigate prior, clearly rejected, positions." *See TechRadium*, 2015 WL 862326, at *7, (S.D. Tex. 2015) (emphasis added). ATEN's attempt to relitigate prior, rejected claim constructions forced Defendants to comply with an accelerated docket and redo work—including claim construction expert reports and depositions—that had already been performed in CDCA, supporting a determination of exceptionality.

12

### 2. ATEN Refused to Withdraw and Forced Claim Construction Briefing in EDTX After the Case was Transferred

The EDTX transferred this case to this Court on the same day that ATEN filed its Opening Claim Construction Brief. (Dkts. 93-94.) With the impending transfer, completion of claim construction briefing in EDTX would be wasteful because EDTX would not rule on the matter, and because the CDCA's rules regarding the number of terms it would consider construing would make most of the EDTX briefing unnecessary. ATEN acknowledges that, "[i]deally, the parties would have jointly moved to suspend the Amended Docket Control Order's deadlines." (Opp. at 12.) But ATEN never gave Defendants this option. Instead of agreeing to withdraw its brief without prejudice or jointly moving to modify the Amended Docket Control Order's deadlines, ATEN unilaterally filed an emergency motion to delay the transfer and to compel Defendants to brief claim construction in a forum that would not construe the claims. (Dkt. 94.) ATEN's aggressive behavior unnecessarily increased costs to the Court and Defendants.

### D. Defendants Successfully Showed that ATEN's Changes in Counsel and Infringement Positions Drastically Increased Costs

#### 1. ATEN's Repeated Changes of Counsel Complicated the Case and Prejudiced Defendants

ATEN's Opposition broadly concludes that "[c]ounsel aimed to pass on its institutional knowledge as much as possible to avoid duplicative work" but provides no declaration or evidence to support this claim. Rather, ATEN relies on attorney argument made by its current counsel that was not present and did not participate in any aspect of ATEN's Original or Final Infringement Contentions, claim construction briefing, or fact and expert discovery.

The record is replete with instances where institutional knowledge and agreements between the parties were *not* passed on between ATEN's changing attorneys. For instance, ATEN does not rebut that ATEN promised to drop claim 1 of the '287 Patent and that new counsel did not honor that agreement. (Dkt. 479-3 at ¶ 60.) As another example, in August 2016 after the close of fact discovery, ATEN's then

1   counsel sent an email indicating that it had not received all of Defendants' source code
2   but "only portions of the software code for three products." (Dkt. 479-3 at ¶ 93.)
3   ATEN's then counsel requested all source code to be produced ignorant to the fact that
4   ATEN's prior counsel had previously inspected and determined that it only needed the
5   limited "portions of the software code for three products." (*Id.*) This duplicative request
6   of ground already tread with ATEN's former counsel resulted in extensive meet and
7   confers, correspondence, and ultimately additional code-review to avoid burdening the
8   Court with even more discovery motion practice. (*Id.* at ¶ 94.)

9          Numerous agreements related to representative products and the scope of the case
10   were also lost during ATEN's changes in counsel. (§ II.E.1, *infra*; Dkt. 479-3 at ¶¶ 142-
11   43.) ATEN itself admits that its counsels' misunderstandings led to the alleged
12   violations of the S.P.R. (Opp. at 17.) The changes in counsel also necessitated extensive
13   presentations at the claim construction hearing (Dkt. 479-3 at ¶ 59.) Deadlines,
14   including those related to discovery and expert reports, were extended to accommodate
15   changes in counsel. (*Id.* at 63.) Trial was extended because agreements could not be
16   reached. Changing counsel after critical junctures without adequately ensuring
17   continuity is exceptional and created real costs and prejudice for Defendants, regardless
18   of whether it was ATEN's intent to do so.

19          ATEN also admits that the size of its case led to a four-month long investigation
20   to verify the legitimacy of one patent claim, even after being notified of the precise
21   deficiencies in that claim. (Opp. at 8; § II.B.4, *infra*.) ATEN now argues that despite
22   such size and complexity in the case, continuity could have been maintained by simply
23   forwarding a few emails—an improper attempt to shift the responsibility and
24   consequences for its actions to Defendants.

25          **2.   <u>ATEN Conducted Rounds of Unnecessary Source Code Review</u>**

26          ATEN mischaracterizes Dr. Lavian's trial testimony regarding the importance of
27   source code. Dr. Lavian did not testify that source code "***was necessary*** in most
28   instances to confirm infringement." (Opp. at 15, emphasis in original.) By contrast, he

testified that there were other ways that he came to an infringement opinion, including reviewing schematics, manuals, the products themselves, or source code. (Tr. 9/20 Vol.2 at 71:24-72:11; Opp. at 15-16) meaning that he "d[id]n't need to look at source code *at all* to make [his] opinion." (Tr. 9/20 Vol.2 at 71:23-24).

ATEN argues that Defendants' generosity in permitting a limited, *second* review after the passing of ATEN's technical expert shows that ATEN's litigation conduct was not inequitable. (Opp at 15.) ATEN also suggests that Defendants' acceptance of payment for the costs incurred with ATEN's *third* review negates any exceptionality arising from its behavior. ATEN's offer to pay does not negate Defendants' prejudice but rather demonstrates that ATEN itself recognizes that its request was outside of the deadlines, unusual, and burdensome. Regardless, ATEN still has not paid for that source code review and Defendants' efforts to cooperate should not be punished.

### 3.  <u>ATEN's Refusal to Amend Its Infringement Contentions Was Exceptional</u>

After ATEN had ample opportunity to review source code, it failed to timely amend its Original Infringement Contentions as required by EDTX P.R. 3.1(g) to narrow the case. (Dkt. 479-3 at ¶ 73.) ATEN's only explanations address the failures of its *Final* Infringement Contentions, but not why it failed to update its *Original* Infringement Contentions along the way as required under the applicable Federal and local patent rules. ATEN's refusal to limit the scope of its original claims as it discovered information supports an exceptionality determination.

ATEN argues that it filed its Final Infringement Contentions in violation of the Court's S.P.R. because of a misunderstanding between ATEN's previous counsel and Defendants' counsel. (Opp. at 18.) The Court has already rejected this argument when it granted Defendants' motion to strike. (Dkt. 345.) A misunderstanding between counsel does not justify blatantly disregarding local rules. "ATEN's only justification seems to be that Uniclass acquiesced to its request to forego supplementing contentions. This is insufficient to show that ATEN acted with diligence in promptly moving to

1  amend when new evidence is revealed in discovery." (Dkt. 345 at 5, citing *O2 Micro*

2  *Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006).) Even if

3  ATEN's mistaken belief was in good faith, the circumstances that led to the mistaken

4  belief are of ATEN's making by not properly passing on its obligations under EDTX

5  rules to subsequent counsel, and it is Defendants that have born the resulting prejudice.

### 4.  ATEN's Delayed Withdrawal of Assertions Against the LKV-248 Product

7  ATEN argues that it in "good faith" delayed withdrawal of its accusation that the

8  LKV-248 product infringed the '141 Patent "until circumstances changed in December

9  2016." (Opp. at 19.) ATEN does not explain what circumstances changed or provide

10  any declaration from its previous counsel describing why it did not withdraw its

11  assertions earlier as provided by the Court's rules and scheduling order. The LKV-248

12  was one of the only products for which ATEN provided infringement claim charts in its

13  Original Infringement Contentions. As such, ATEN's infringement analysis of the

14  product largely defined the scope of ATEN's infringement theory for the '141 Patent.

15  ATEN maintained its accusations against the LKV-248 and its corresponding

16  infringement theory through Defendant's invalidity contentions, claim construction,

17  source code production, and close of fact discovery. In turn, Defendants tailored their

18  claim construction, invalidity contentions and discovery to the scope defined by

19  ATEN's accusation of the LKV-248. (Dkt. 479-3 at ¶ 33.) After claim construction and

20  after Defendants' invalidity theories were solidified and no additional discovery could

21  be taken, ATEN withdrew its accusations against the LKV-248, thereby changing the

22  scope of its infringement theory.

23  Defendants' strategic decision to not raise the LKV-248 as a prior art reference

24  to the '141 Patent at trial (in part, because of the altered claim scope of the '141 Patent)

25  does not make ATEN's tactic less exceptional as ATEN now argues in its Opposition.

26  ATEN could (and should) have amended its claim charts and infringement contentions

27  at multiple times during the case, at least after it inspected the source code and actual

28

16

prior art product in March 2015, but chose to amend only after Defendants could not take additional discovery.

**5.** **ATEN's Refusal to Vacate the Trial Date While Defendants'**
**Motion to Strike the Final Infringement Contentions Was**
**Pending**

ATEN's refusal to vacate the trial date because of a belief that Defendant's motion to strike (Dkt. 252) would be denied was unreasonable. A reasonable litigant would have understood that ATEN's shifting sands approach to infringement contentions would require the Court to settle matters such as which claims and which products remained for trial. Defendants warned in its motion to vacate, "if stock is not taken now and the trial date vacated, Defendants anticipate a flurry of unnecessary motions and hearings to attempt to hone the relevant issues prior to trial – including extensive motions in limine, various Daubert motions both on adequate support for ATEN's new infringement contentions, its methodology, qualifications of its experts for the expanded theories, motions regarding the extent of claimable damages, and possibly multiple and inconsistent dispositive motions based on ATEN's expanded and inconsistent infringement theories." (Dkt. 260 at 5.) Defendants' predictions were all fulfilled at great cost to Defendants. (Dkt. 479-3 at ¶ 126.)

If the Court had denied Defendants' motion to strike as ATEN hoped and believed, then ATEN would have lost nothing by waiting for that decision as the parties could then have adjusted the remaining expert discovery and pre-trial time-line accordingly. ATEN was ultimately incorrect and capitulated to narrowing the issues, but only after Defendants spent significant time and money to force the issue.

ATEN also argues that its refusal to vacate the trial date was reasonable because it sought an injunction. First, ATEN did not seek a preliminary injunction. ATEN also knew whatever injury had been caused would be remedied through monetary damages because there was no irreparable harm. Indeed, ATEN's primary form of relief was seeking a reasonable royalty based on a royalty rate from a license it had entered with Uniclass, which along with licenses to five other competitors, shows ATEN's

17

willingness to license, negating a claim for injunctive relief. In these instances, a reasonable royalty rate is generally provided *instead of* an injunction, and not *in addition to* an injunction. *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1315 (Fed. Cir. 2012). ATEN's inability to obtain an injunction further demonstrates it unreasonableness in not vacating the trial date.

### 6.   ATEN's Experts' Contradictory Positions on the '287 Patent

In its Opposition, ATEN proposes that Mr. Narad's position that "[w]hen *synchronous switching* occurs, any connection between a switched peripheral device and a host computer is *necessarily changed or interrupted*" indicates that there are two distinct possibilities for data flow during synchronous switching. (Dkt. 93-1 at 5, emphasis added). ATEN's blinkered interpretation cannot be what Mr. Narad meant. In his declaration, Mr. Narad explained, "a POSITA would understand that a selected peripheral device cannot be switched away from the first selected computer system *without interrupting the data flow* between the selected peripheral device and the first selected computer system, and thus *the data flow may not continue without interruption* in the case of *synchronous switching* . . . . It would be obvious to a POSITA that, in light of [synchronous] switching, the first selected computer *can no longer communicate* with the selected peripheral device and thus the data flow between them is *interrupted*." (Dkt. 93-1 at ¶ 74, emphasis added.)

ATEN's argument that Mr. Narad's position somehow leaves the potential for an uninterrupted, but "changed" data flow is baseless and contradicts the positions it held until trial. Dr. Lavian's position that "[t]he accused instrumentalities have console devices that can be switched *either synchronously* or asynchronously with one peripheral device to the same computer system or to different computer systems, *without interruption of the signal to the peripheral device*," is completely contradictory to the original infringement positions held by ATEN and its original expert, Mr. Narad, and supports a determination of exceptionality. (Dkt. 336-8 at 4.)

ATEN next argues that even if the expert opinions are inconsistent, that inconsistency is permissible because of the additional source code that Dr. Lavian reviewed in his independent investigation. However, ATEN admits that it does not know whether that information was available to Mr. Narad. (Opp. at 20.) This is unsurprising since many generations of law firms separate ATEN's current counsel and ATEN's counsel at the time Mr. Narad submitted his declaration. Even so, Mr. Narad did or should have had access to whatever source code Dr. Lavian investigated, because ATEN had inspected all of Defendants' source code on March 24-26, 2015 and Defendants had provided the entire source code of the LKV-248 on March 26, 2015. (Dkt. 479-3 at ¶¶ 26-27, 70-71.) Mr. Narad's declaration was filed on May 15, 2015. (Dkt. 93-1.) There is no source code that Dr. Lavian would have had access to that Mr. Narad would not also have had when their respective conclusions about the '287 Patent were made.

ATEN also argues that it can present contradictory infringement theories because its new expert, Dr. Lavian, conducted his own independent investigation and came to a different conclusion. (Opp. at 20.) ATEN did not timely move to amend its infringement contentions upon learning new information. ATEN cites no authority justifying its position that it can unilaterally change its infringement positions because it changed its expert. ATEN's experts taking contrary positions is extraordinary and required Defendants to unnecessarily cover all bases in depositions, expert reports, and invalidity contentions. *See Sonix Tech. Co. Ltd. v. Yoshida*, No. 12-cv-380-CAB, Dkt. 348 at 4 (S.D. Cal. May 23, 2016) (awarding fees where plaintiff "abrogated its duty to undertake independent pre-filing infringement investigation, and asserted positions in the litigation that were vague, confusing and contradictory.")

### E. Defendants Successfully Showed that ATEN's Litigation Behavior was Unreasonable Requiring Unnecessary Motion Practice Leading Up to Trial

#### 1. ATEN's Last-Minute Change to Product Groupings

ATEN claims that it "never sought to add *new products* to its product groupings, but rather *additional names* for the same products already listed." (Opp. at 22.) ATEN is correct that these are functionally the same products. However, the difference between the products that ATEN included in its proposed groupings and those it included in its proposed jury instructions is ***the party that manufactures and/or sells that product***. After the Court struck dozens of accused products, it became clear that ATEN lacked standing against some or all of the Customer Defendants. To retain claims against the Customer Defendants (even claims for only a few hundred dollars), ATEN attempted to include an additional name for the same product in its proposed jury instructions to keep the Customer Defendants. The Court, seeing the inequity of allowing ATEN to expand its product groupings just days before trial, granted Defendants' motion *in limine* to prevent ATEN from expanding the product groupings. (Tr. 9/19 at 13:7-8.) Once the Court granted Defendants' motion *in limine*, ATEN had no claim against Black Box and was forced to dismiss it from trial. (*Id.* at 107:13-108:6.) ATEN's disregard for the parties' agreement and the Court Order regarding the parties proposed groupings (*see* Dkt. 350) is exceptional and required unnecessary motion practice on the eve of trial.

#### 2. ATEN's Meritless Lost-Profits Claim

The meritless nature of ATEN's lost profits position, and not merely its lack of success, justifies a fee award. ATEN lost profits position relied on "multiple layers of guesswork," "d[id] not embody the use of sound economic principles," and did not provide enough economic proof to prevent lapsing into "pure speculation." (Court's Order Granting Defendants' Motion for Summary Judgment, Dkt. 363 at 5.)

ATEN's Opposition provides no argument to justify the merits of the lost-profits position other than to say Mr. Snell's theory was "reasonable." (Opp. at 22.) Even so,

20

ATEN admits that Mr. Snell "lacked sufficient data to conduct a market-share analysis" and created a mapping theory, "because no market-share data was available." (*Id.*) ATEN also argues that its assumption that ATEN would have exclusively made Defendants' sales but for the alleged infringement is reasonable. The Court identified the errors in this approach, pointing out that this position was made "without independent support" and makes flawed assumptions. (Dkt. 363 at 4-5.) ATEN's reliance on a method based on insufficient data, unsupported conclusions, and flawed assumptions is unreasonable, and Defendants should not have to bear the fees and costs associated with responding to it.

**F.** **Defendants Successfully Showed that ATEN's Litigation Behavior was "Exceptional" and "Led to an Expensive and Disproportionate Trial"**

**1.** **ATEN's Disproportionate Costs Compared to Requested Damages**

ATEN does not dispute that its litigation and trial behavior is disproportionate to the damages requested at trial. ATEN also failed to respond in its Opposition to the Court's warning that it was "exceedingly cautious about how much [it] allow[s] [ATEN] to use this courtroom and this jury." (Tr. 9/25 at 12:16-13:4.) Likewise, ATEN failed to respond to the Court's remark at trial, "I have just never seen anything like this," referencing the time and resources spent by ATEN in relation to its potential recovery. (Tr. 9/28 at 102:15-21.

ATEN argues that high technical expert fees are not unreasonable where "extensive source-code review was necessary." ATEN's argument is unavailing in light of its expert's testimony that he "d[id]n't need to look at source code *at all* to make [his] opinion." (Tr. 9/20 Vol.2 at 71:23-24, emphasis added.) ATEN also admits that source code review was not necessary because of the availability of manuals, schematics, and the products themselves. (Opp. at 15-16.) ATEN's argument that its disproportionate expenditures are reasonable considering its lost profits claim is also unpersuasive, because ATEN readily admits that Mr. Snell did not have sufficient data to support a

lost profits claim and the lost profits claim was dismissed well before trial. (Opp. at 22; Dkt. 363.)

ATEN's last-minute attempt to "streamline the issues" was an offer to dismiss certain claims *without prejudice*. Defendants reasonably rejected that offer because of fear based on ATEN's propensity to litigate and threats that it would simply sue Defendants again. Presented with this offer on the eve of trial after having already spent considerable time and resources preparing to try all issues, Defendants rejected this offer so that it would not be subjected to a duplicative re-trying of any issues dropped without prejudice.

### 2. ATEN's Meritless Reasonable Royalty Position

In its Opposition, ATEN does not identify any *Georgia-Pacific* analysis by Mr. Snell. It simply argues that Mr. Snell did not need to conduct a *Georgia-Pacific* analysis. (Opp. at 24.) ATEN's reliance on *Whitserv, LLC v. Computer Packages, Inc.* for this proposition is misplaced. Although *Whitserv* allows witnesses to testify without using the *Georgia-Pacific* factors, it does not allow an expert to testify without providing adequate analysis: "[i]f [a witness] choose[s] to use [the *Georgia-Pacific* factors], however, reciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration. Expert witnesses should concentrate on *fully* analyzing the *applicable* factors . . ." *Whitserv, LLC v. Computer Packages, Inc.* 694 F.3d 10, 31 (Fed. Cir. 2012) (internal reference omitted, emphasis in original). As ATEN notes, "Dr. Snell also testified that he did analyze the *Georgia-Pacific* factors in forming his opinion." (Opp. at 24.) However, once that alleged reliance on *Georgia-Pacific* was established, Mr. Snell did not fully analyze the applicable factors, claiming that such an analysis was unnecessary in light of the parties' analyses before entering their respective licenses. (Tr. 9/26 at 34:17-35:2; 68:5-12.)

When Mr. Snell did consider *Georgia-Pacific* Factor 8 (profitability), he concluded, "a 7.5% royalty would probably be too high." (Tr. 9/26 at 69:3-5.) ATEN

does not dispute this candid admission. Similarly, ATEN does not dispute that Mr. Snell did not allow ATEN's license with third parties StarTech or Belkin to influence his reasonable royalty rate. (Mot. at 23.) ATEN also does not dispute that Mr. Snell assumed that the pre-amendment royalty rate of the May 2009 license applied equally to the rights at issue at trial, despite clear differences from the rights at issue in the license and despite significant changes in the circumstances surrounding the formation of the May 2009 license and the hypothetical license.

Mr. Snell's trial testimony spent reciting numbers from his demonstratives without explaining the underlying calculations or justifications was exactly the type of damages testimony disallowed in *Lucent Techs., Inc. v. Gateway, Inc.*, where the court explained, "a damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers" and jurors cannot rely on "superficial testimony" with, "no analysis." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009). ATEN's royalty position was abnormally weak and supports an exceptionality determination.

## III.   CONCLUSION

Defendants have demonstrated that they are entitled to attorney's fees and costs under 35 U.S.C. § 285. Accordingly, Defendants request that the Court grant their motion and enter the proposed order.

Dated: February 12, 2018                   Respectfully submitted,


                                          /s/ Joseph G. Pia
                                          Robert Aycock (*pro hac vice*)
                                          raycock@pa-law.com
                                          Joseph G. Pia (*pro hac vice*)
                                          joe.pia@pa-law.com
                                          William B. Chadwick (*pro hac vice*)
                                          wchadwick@pa-law.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PIA ANDERSON MOSS HOYT
136 East South Temple, 19th Floor
Salt Lake City, UT 84111
T: 801-350-9000
F: 801-350-9010

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
LT PACIFIC LAW GROUP, LLP
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendants
UNICLASS TECHNOLOGY CO.,
LTD., ELECTRONIC TECHNOLOGY
CO., LTD. OF DONGGUAN
UNICLASS, AIRLINK 101, PHOEBE
MICRO INC., AND BROADTECH
INTERNATIONAL CO., LTD. D/B/A/
LINKSKEY, BLACK BOX
CORPORATION, and BLACK BOX
CORPORATION OF PENNSYLVANIA

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR EXCEPTIONAL CASE DETERMINATION UNDER 35 U.S.C. § 285** filed electronically, and pursuant to Civil L.R. 5-3.2, was served on all interested parties in this action (i.e., served to registered ECF recipients via ECF electronic service) on February 12, 2018.

/s/ *Joseph G. Pia*
Joseph G. Pia